273 N.J. Super. 300 (1994)
641 A.2d 1091
KERRY A. FUREY, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF EUGENE T. FUREY, DECEASED, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
COUNTY OF OCEAN AND THOMAS APPLEGATE, DEFENDANTS-RESPONDENTS/CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1994.
Decided May 20, 1994.
*303 Before Judges SHEBELL, LONG and LANDAU
Stephen J. DeFeo argued the cause for appellant/cross-respondent (Brown & Connery; Mr. DeFeo, on the brief).
Peter J. Van Dyke argued the cause for respondents/cross-appellants (Kelaher, Garvey, Ballou & Van Dyke; Mr. Van Dyke, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
This is a wrongful death action brought under the Tort Claims Act (N.J.S.A. Title 59). The direct appeal involves an issue of first impression, i.e., whether N.J.S.A. 59:9-2e remains viable following the enactment of N.J.S.A. 2A:15-97.
While responding to an emergency call on November 20, 1988, Eugene Furey, a volunteer fireman, was killed when he lost control of the 1987 Chevrolet Blazer he was driving and struck a tree. On August 7, 1989, his surviving spouse and administratrix of the estate, Kerry A. Furey, filed a Wrongful Death and Survival Action. The Fureys had one child, Megan, on whose behalf the action was also brought. The Complaint named as defendants, the County of Ocean (County), the State of New Jersey, and the Borough of Beachwood, where the accident occurred. By order dated August 7, 1992, plaintiff was granted leave to amend her complaint to add the claim against Thomas Applegate, the County road foreman. At the time of jury deliberations, only the wrongful death action against the County and Applegate, remained. It was alleged that decedent's death was caused by a dangerous condition on public property and a failure to warn of that dangerous condition.
*304 On December 6, 1991, the County moved for summary judgment arguing that no dangerous condition existed and that it had no duty to warn. The County's motion was denied. On November 29, 1992, the jury returned a verdict in plaintiff's favor and against the County only. The jury apportioned 40% fault against plaintiff's decedent, 60% against the County, and awarded $475,000 in total damages.
After the verdict, the County requested a credit, pursuant to N.J.S.A. 59:9-2e, for Workers' Compensation and Social Security benefits. Plaintiff then moved for an additur, or in the alternative, a new trial as to damages, for counsel fees pursuant to N.J.S.A. 59:9-5, and for the appointment of a guardian ad litem for Megan. The County cross-moved for a new trial.
On January 7, 1993, the trial judge denied the plaintiff's motion for additur or a new trial on damages, the plaintiff's request for the appointment of a guardian ad litem, and the County's motion for a new trial. The judge granted the County's request for credits for Workers' Compensation and Social Security[1] benefits pursuant to N.J.S.A. 59:9-2e "subject to the distribution hearing and the Court's determination of the amount of any credits which the defendant is to receive and the extent to which the distributive shares of Kerry and Megan Furey may be reduced."
By letter dated January 13, 1993, plaintiff's counsel reiterated his request for the appointment of a guardian ad litem and for a hearing to determine the value of the distributive shares and the present value of the credits which the judge had ruled would be applied. At a hearing held on February 19, 1993, after applying credits for Workers' Compensation and Social Security benefits, the trial judge determined that a net sum of $21,626.25 remained for distribution to the estate. The judge did not apportion the verdict or the credits between Mrs. Furey and her daughter, *305 Megan. Also at the hearing, the judge awarded counsel fees of $15,000, pursuant to N.J.S.A. 59:9-5.
Later that same day, the attorney for the County submitted a letter to the judge, bringing to his attention an additional Workers' Compensation credit that was not included in the initial determination. The trial judge, by letter dated February 22, 1993, stated "that the court, in fact, did err in omitting to consider the present value of future payments to Megan Furey from the period of July 7, 1997 to June 3, 2002." The judge concluded that since the total credit to the County was greater than the jury verdict, no monetary judgment would be entered against the County. The judge then stated that since plaintiff had entered into a contingency fee arrangement with counsel, it would not be appropriate to grant an attorney's fee.
On March 25, 1993, the court entered its final order and judgment setting forth that pursuant to N.J.S.A. 59:9-2e, the County was entitled to $294,820.80 in credits for benefits payable to Kerry Furey and Megan Furey from the Workers' Compensation award and from the Social Security Administration. Since these credits exceeded the County's percentage share of the jury verdict, 60% of $475,000 or $285,000, the judge held that plaintiff could have no recovery.
Plaintiff appeals from the credits allowed and defendant appeals from the judgment of liability.
The parties stipulated as to the following facts at the time of trial:
In the early morning of November 20th, 1988 Eugene Furey, age twenty-eight and a volunteer fireman with the Bayville Fire Department died from injuries he sustained when the 1987 Chevrolet Blazer he was driving crashed into a tree in Beachwood, New Jersey. There were no eyewitnesses to the accident.
At the time of the accident Mr. Furey in his capacity as a volunteer fireman was responding to an emergency call and he was proceeding from his home on Spruce Street in Beachwood to the Bayville Fire Department substation. He was traveling south on Pinewald Road just prior to the accident.
Pinewald Road in its entire right-of-way is and was owned, maintained and controlled by the defendant, Ocean County. The defendant, Thomas Applegate, was and still is the road foreman for the area of Pinewald Road where the accident *306 occurred. Mr. Applegate was and still is an employee of Ocean County. As a road foreman for Pinewald Road, Mr. Applegate was and still is the person responsible for the inspection, maintenance and repair of Pinewald Road and its adjoining right-of-way and shoulder.
Mr. Furey had been married to Kerry Furey, the plaintiff in this case and the duly appointed representative of Mr. Furey's estate. Gene and Kerry Furey had a daughter, Megan, who was born in 1984 and is currently eight years old.
Plaintiff's theory of liability was that the County failed to inspect, maintain, or repair the dirt shoulder adjacent to the paved portion of Pinewald Road. At trial, the police officer in charge of the investigation testified as to the following:
[m]y conclusion was that Mr. Furey's vehicle had a reaction, okay, to right wheel drop-off, and as a result of the right wheel drop-off, the vehicle lost control or he lost control of the vehicle and struck the tree on the opposing side.
In drawing his conclusion, the police lieutenant took into consideration the road condition, the weather at the time, the right wheel drop-off, and that decedent was negotiating a curve. He described a right wheel drop-off as "a difference in the level of two road surfaces, in this case I referred to it as a berm, an unpaved portion, that ... a vehicle could pull over to the side of the roadway." The drop-off generally ranged between two and four inches, and was as high as six inches at the worst portion. The officer opined that this drop-off was a substantial contributing factor to the cause of the accident.
The officer testified that when he arrived at the scene of the accident, it was raining hard and the roadway was slippery. He could not make any specific observations that day for such things as tire marks, because the area of the berm was flooded. On the day after the accident, when the officer did his vehicle data collection sheet analysis, he took a photograph depicting a tire print in the dirt portion of the roadway that he believed was made by decedent's vehicle.
Plaintiff's expert, Herman J. Rich, a consulting civil engineer, testified that he examined the scene of the accident on May 24, 1989, and categorized it "as a rural-type, two-lane road constructed without paved shoulders but with earth or sandy-type roadside shoulders." The unpaved shoulder was composed of "sandy, silty *307 material." He opined that the accident occurred in the following way:
It occurred as a result of the driver of the vehicle, Mr. Furey, attempting to get back onto the pavement with the right wheels of his vehicle after they dropped off onto the depressed surface, and having reached the critical steer angle  I may have to explain this, I'm sure I have to explain this in greater detail  that when he first mounted the pavement with the right front wheel, which necessarily had to be steered fairly sharply in order to attain what's called a critical steer angle, that the car began to yaw and literally went across the road on a diagonal as evidenced by the tire marks at such a rapid rate that he had no opportunity to recover and hit the tree.
He noted that since the roads were wet, it would exacerbate a slide. He explained why drop-offs are so dangerous and what usually happens:
with only three wheels of the car on the pavement, the car starts to counterclockwise yaw. It starts a kind of a slow spin-out toward the left. So, consequently, as the car, the vehicle, crosses the pavement, as it yaws toward the left, the passenger's side becomes the leading side. That side is the side that's exposed to any trees, and that's why you find very often, also in this case, that it's the right side of the vehicle that hits the tree or whatever other obstruction there is there.
Rich opined that the drop-off would have been clearly visible to anybody looking for it, such as someone involved in the construction or maintenance of the road. He believed that the magnitude of risk presented by this drop-off posed a substantial hazard to passing motorists. Rich asserted that there was no doubt that the right wheels of decedent's vehicle traveled from the paved portion of the road onto the berm. He further testified: "People are constantly straying off the paved portion of a road onto a shoulder without incident. That's not an accident. The accident is if they encounter a shoulder that can't properly receive that vehicle and create the trap that Furey apparently found himself in."
Numerous deposition transcripts of employees of the County were read into evidence by the plaintiffs demonstrating that it was the responsibility of County employees to monitor the roads regularly and to repair and maintain situations where there was erosion on the shoulder. The County admitted that its road department maintained the traveled roadways and was responsible for keeping them in a safe condition. The objective was to have *308 the shoulder level with the paved roadway if possible. Typically, if a drop-off were three to four inches, the foreman would get someone out there to fix it. A County employee acknowledged that a drop-off could be dangerous and affect a driver's control.
In rebuttal, the County presented a portion of the deposition of the assistant road supervisor for the County, wherein he stated that the County did not become concerned about a drop-off unless it were five or six inches. If the drop-off were in an area where there were "a few houses," he would want something done immediately to repair it.
The County engineer testified that "roadway" usually referred to the whole pavement, but they broke it down into the "traveled way," which was the portion of the pavement which actually had the traffic lanes on it, and the shoulder, which was the portion beyond the traffic lanes. He explained the priority of maintenance of the roads in the County. Of greatest concern, was the traveled way, i.e., the actual driving lanes of the roadways. The second highest priority was the shoulder because it structurally supported the pavement. On cross-examination, he agreed that the roadside was difficult to maintain in this area because of the sandy soil conditions.

I
We deem it advisable to first consider the arguments raised by defendant in its cross-appeal concerning the County's liability. The County urges that the trial court erred in determining that the plaintiff's proofs established a cause of action under N.J.S.A. 59:4-1a and N.J.S.A. 59:4-2. At trial, the judge denied defendant's motion for a directed verdict as to these statutes, stating:
my determination is that if the county does undertake to do it, they have a duty to do it in a proper fashion, and as the testimony reflected here, two things. One is as my recollection serves me, the county laborers and the road department indicated that part of their job is to transverse [sic] this particular roadway and to look for particular dangerous conditions; and, two, that once those conditions in their determinations are found, then they have the authority to do something about *309 it. And it's my judgment that the cases are saying that once you undertake that particular obligation, then your duty is to perform that in a prudent and reasonable manner. So I will deny your motion.
Our standard of review under these circumstances is whether the evidence, together with legitimate inferences that can be drawn from it, could sustain a judgment in favor of the party opposing the motion. R. 4:37-2(b). This includes accepting as true all evidence supporting the party opposing the motion and according that party the benefit of all favorable inferences, and if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969).
Defendant argues that the trial court should have dismissed the case at the close of plaintiff's proofs or granted a new trial after the verdict because plaintiff failed to prove a cause of action under the Tort Claims Act. We conclude that the evidence presented by the plaintiff did establish a cause of action.
N.J.S.A. 59:4-2 provides the following:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
[Emphasis added.]
"Dangerous condition" is defined under the Act as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1a.
*310 It was necessary for plaintiff to prove that the drop-off on Pinewald Road constituted a dangerous condition; that the dangerous condition proximately caused the injury; that the dangerous condition created a reasonably foreseeable risk of the kind of injury incurred; and that either an employee of the County created the dangerous condition or that the County had actual or constructive notice of the dangerous condition.
Defendant contends that the evidence cannot support the assertion that the physical condition of Pinewald Road constituted a dangerous condition of public property. Defendant explains that the traveled portion was in good condition and had no defects, and that it was delineated by a white fog line. Defendant also argues that the "fatal flaw" in plaintiff's argument is that she cannot establish why the Furey vehicle left the roadway.
Several possible reasons were presented at trial as to why decedent left the roadway. Plaintiff argues, however, that "[r]egardless of the reason for leaving the pavement initially, if the shoulder had been properly maintained Gene would have been able to recover and get safely back onto the pavement without incident and the accident never would have occurred." In determining if the drop-off created a dangerous condition, it is irrelevant why decedent's vehicle left the road. What is relevant is whether Pinewald Road and the adjacent shoulder area were in a dangerous condition at the time of the accident, i.e., was there "a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1a. Here, it was reasonably foreseeable that a vehicle's wheel might enter onto the shoulder for a variety of reasons, such as to avoid a car or animal, or even inadvertence.
Defendant cites the recent decision in Levin v. County of Salem, 133 N.J. 35, 626 A.2d 1091 (1993). There, plaintiff was paralyzed when he dove from a county bridge into shallow water. Id. at 37, 626 A.2d 1091. The Court held that the bridge was not "in dangerous condition" merely because it spanned shallow water. Id. at 37, 49, 626 A.2d 1091. Rather, the Court observed, the *311 cause of plaintiff's injury was "the dangers of unsupervised recreational activity for which there is no public-entity liability under the Act." Id. at 37, 626 A.2d 1091.
The employees of the County admitted that it was their job to repair drop-offs such as a jury might find existed at the location of decedent's mishap. It was the responsibility of County employees to monitor the roads regularly and to repair and maintain situations where there was erosion on the shoulder. The County admitted that its road department maintained the roadways and was responsible for keeping them in a safe condition. A County employee acknowledged that a drop-off can be dangerous. If fill dirt were needed to level an erosion problem, a crew was called in. The objective was to have the roadside level with the paved portion. A jury could reasonably find that failure to accomplish this objective created a substantial risk of injury.
Defendant relies on Daniel v. State, Dep't of Transp., 239 N.J. Super. 563, 589, 571 A.2d 1329 (App.Div.), certif. denied, 122 N.J. 325, 585 A.2d 343 (1990), for the proposition that the County owes no duty to protect individuals against the "unreasonable driving habits of others." Here, however, there was evidence that the roadway was not safe for drivers in general because it did not have an adequately maintained shoulder, and because of the foreseeable necessity that drivers might, while traveling, have to pull over slightly onto the shoulder of such a two-lane roadway for numerous reasons. Therefore, a jury could find that the Pinewald Road right-of-way, because of the drop-off just beyond the fog line, constituted a substantial risk of injury for a driver exercising due care and using the road in a manner which was reasonably foreseeable.
We considered the "used with due care" language of N.J.S.A. 59:4-1a in Daniel, supra, and rejected the argument that the actual conduct of the plaintiff would be relevant in determining if a dangerous condition existed. We held in Daniel:
a dangerous condition exists if the property poses a substantial risk of injury when it is used in a reasonably prudent manner in a foreseeable way. To that extent, the *312 reasonable user requirement does not refer to the actual activities of the plaintiff or others. Rather, it constitutes a personification of a community ideal of reasonable behavior.

[239 N.J. Super. at 587, 571 A.2d 1329.]
In Speziale v. Newark Hous. Auth., 193 N.J. Super. 413, 419, 474 A.2d 1085 (App.Div. 1984), we held that a plaintiff may be able to establish the existence of a dangerous condition as defined by N.J.S.A. 59:4-1a even though he or she personally may have been contributorily negligent. We determined, nonetheless, that the trial judge should have granted an involuntary dismissal at the end of plaintiff's case because plaintiff had notice of the dangerous condition and plaintiff's mere use of the property in itself constituted a lack of due care. Id. at 417, 474 A.2d 1085. That cannot be said to be the case here. In Speziale, we set forth an objective standard test for these situations, which is as follows:
the test is whether the condition created a substantial risk of harm to persons, generally, who would use the public property with due care in a foreseeable manner. [Citations omitted]. Accordingly, in order to prove his case, plaintiff must show "that the condition was one that created a hazard to a person who foreseeably would use the property ... with due care." ... [Citations omitted]. He need not, however, allege that he was free from contributory negligence....
[Id. at 419, 474 A.2d 1085 (quoting Holmes v. Oakland City, 260 Cal. App.2d 378, 67 Cal. Rptr. 197, 203 (1968)).]
A plaintiff must also prove that the injury was proximately caused by the dangerous condition and that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred. N.J.S.A. 59:4-2. There was evidence that the County's failure to properly inspect, maintain, and repair the shoulder of the roadway was a proximate cause of the decedent's loss of control of the vehicle which sent it across the roadway and into a tree, causing his fatal injury. Issues of proximate cause such as are presented here should be left to the jury. Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1 (1959).
Finally, under N.J.S.A. 59:4-2, a plaintiff must also show that the public entity's conduct was "palpably unreasonable." This means that the public entity acted or failed to act under *313 circumstances which make it manifest and obvious that no prudent person would approve of its course of action or inaction. Holloway v. State, 125 N.J. 386, 403-04, 593 A.2d 716 (1991). Whether the conduct of the County were "palpably unreasonable" in these circumstances was an issue for the jury. See Wooley v. Board of Chosen Freeholders, 218 N.J. Super. 56, 62-63, 526 A.2d 1116 (App.Div. 1987); Shuttleworth v. Conti Constr. Co. Inc., 193 N.J. Super. 469, 474, 475 A.2d 48 (App.Div. 1984).
Therefore, the trial court did not err when it determined that the plaintiff's proofs were sufficient to establish a cause of action under N.J.S.A. 59:4-1a and N.J.S.A. 59:4-2. The trial court properly denied defendant's motion for a directed verdict and submitted the case to the jury, and thereafter, based on the evidence adduced at trial, correctly ruled that the jury's verdict was amply supported by the evidence and should not be disturbed.
Defendant also argues in its cross-appeal that the trial court incorrectly determined that the plaintiff's proofs established a cause of action under N.J.S.A. 59:4-4 and N.J.S.A. 59:4-5.
N.J.S.A. 59:4-4 states the following:
[s]ubject to section 59:4-2 of this act, a public entity shall be liable for injury proximately caused by its failure to provide emergency signals, signs, markings or other devices if such devices were necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.
N.J.S.A. 59:4-5 provides the following:
[n]either a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices.
The Comment to N.J.S.A. 59:4-4, as taken from the Report of the Attorney General's Task Force on Sovereign Immunity  May 1972, states that a warning is necessary when the condition constitutes a "trap" to a person using the street or highway with due care.
At trial, the court denied defendant's motion for a directed verdict dealing with these statutes. The judge stated:

*314 the testimony as I recall, and I'm giving all due inferences to the plaintiff's case, is twofold. First of all, there's testimony from the road supervisors to the effect that a drop-off is in fact a dangerous condition, that the purpose for which they maintain the shoulder of the roads is to permit people who do drift off the paved portion to be able to accommodate the vehicle coming back onto the roadway. And then you have the testimony of the expert who says that a drop-off where you have two to four to six inches of a drop-off would cause similar to a railing I guess effect he said on a railroad track. It catches the right wheels as a result of which the operator of the vehicle has to have a very severe angle to come back onto the main roadway and thus he could lose control of the vehicle and that the purposes of having no drop-off is to accommodate that driver. So a jury can very well infer or find from the facts in this case, one, that a dangerous condition did exist, and, two, as a result of that dangerous condition, a warning should have been placed.
Defendant argues that Pinewald Road did not constitute a trap and, therefore, did not require an emergency warning sign. Defendant cites, among other cases, Kolitch v. Lindedahl, 100 N.J. 485, 497 A.2d 183 (1985) (holding the public entity was immune for not warning of the existence of "vertical sag curve."); Smith v. State, Dep't of Transp., 247 N.J. Super. 62, 588 A.2d 854 (App.Div. 1991), certif. denied, 130 N.J. 13, 611 A.2d 651 (1992) (holding low overpass over a highway was not an emergency so as to impose liability on the public entity for failure to post a warning sign and the overpass involved a long-standing traffic or road condition rather than a sudden or unexpected condition.); and Spin Co. v. Maryland Casualty Co., 136 N.J. Super. 520, 347 A.2d 20 (Law Div. 1975) (holding public entity was not under a duty to post emergency traffic sign for highway overpass where no sudden or unexpected occurrence existed which showed a high degree of risk to the public.).
The situations in the cases cited were very different from the present case. In this case, County employees stated at depositions that they repaired such drop-offs on a regular basis, and that they would have sent someone to repair one of the size described. This was not a condition that was readily visible to drivers, as would be a bridge overpass or a vertical sag curve on a traveled roadway. A driver could not reasonably be expected to have been aware of the sharp drop-off in time to monitor his or her driving *315 accordingly. Therefore, a jury could find that a warning of the condition or the possibility of its presence was required.

II
In her appeal, plaintiff asserts that the post-jury verdict ruling by the trial court that permitted the County to receive a credit for Workers' Compensation benefits was in error. Plaintiff challenges the trial judge's exclusive reliance on N.J.S.A. 59:9-2e, and failure to consider the exemption of Workers' Compensation benefits under N.J.S.A. 2A:15-97, which modified the collateral source rule. We disagree.
N.J.S.A. 59:9-2(e), the collateral source provision applicable to tort claims against public entities, provides:
If a claimant receives or is entitled to receive benefits for the injuries allegedly incurred from a policy or policies of insurance or any other source other than a joint tortfeasor, such benefits shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award against a public entity or public employee recovered by such claimant; provided, however, that nothing in this provision shall be construed to limit the rights of a beneficiary under a life insurance policy. No insurer or other person shall be entitled to bring an action under a subrogation provision in an insurance contract against a public entity or public employee.

[Emphasis added.]
"The intent of subparagraph (e) is to prohibit the receipt of duplicate benefits by a claimant filing suit under the act." Comment, N.J.S.A. 59:9-2. Therefore, N.J.S.A. 59:9-2e must be interpreted to effectuate this intent. Ayers v. Township of Jackson, 202 N.J. Super. 106, 126-27, 493 A.2d 1314 (App.Div. 1985), aff'd in part, rev'd in part, 106 N.J. 557, 525 A.2d 287 (1987). The Tort Claims Act, which was effective July 1, 1972, does not exempt Workers' Compensation benefits from this provision. Notably, this provision bars actions based on subrogation rights contained in an insurance contract.
Plaintiff alleges that the trial judge failed to properly consider N.J.S.A. 2A:15-97, which provides as follows:

*316 In any civil action brought for personal injury or death, except actions brought pursuant to the provision of P.L. 1972, c. 70 (C. 39:6A-1 et seq.), if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable. Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
[Emphasis added.]
The effective date of this statute was December 18, 1987, which, as plaintiff points out, followed the enactment of N.J.S.A. 59:9-2e, but preceded this accident. N.J.S.A. 2A:15-97 specifically exempts workers' compensation benefits.
We have construed the intent of N.J.S.A. 2A:15-97 as follows:
The overriding legislative intent of the Legislature in adopting N.J.S.A. 2A:15-97 was to prevent a claimant from receiving benefits beyond the damages awarded under a judgment entered and to relieve defendants and insurance companies from having to compensate plaintiff for damages in excess of the total amounts of their losses.
[Kiss v. Jacob, 268 N.J. Super. 235, 246, 633 A.2d 544 (App.Div. 1993).]
Conflict arises because N.J.S.A. 2A:15-97 authorizes a deduction for any benefits received from other sources in "any civil action brought for personal injury or death," without exempting actions under Title 59. Plaintiff argues that the Legislature is presumed to have been aware of N.J.S.A. 59:9-2e when it enacted N.J.S.A. 2A:15-97 and it chose not to carve out an exception for Title 59, while specifically exempting certain Title 39 claims.
In addition, a respected treatise on the Tort Claims Act, in its discussion of N.J.S.A. 59:9-2e, states:
Subsection e is the collateral source rule applicable in actions against public entities and employees. With the passage of the Laws of 1987, Chapter 326, effective December 18, 1987 [N.J.S.A. 2A:15-97] the collateral source rule was statutorily amended to provide for disclosure and crediting of all benefits received from other than a joint tortfeasor except workers' compensation benefits or life insurance proceeds.

*317 [Margolis and Novack, Claims Against Public Entities (1993), Comment to N.J.S.A. 59:9-2(e) at 134 (emphasis added).]
These commentators conclude that N.J.S.A. 59:9-2e was statutorily amended by N.J.S.A. 2A:15-97, and that now Workers' Compensation benefits may not be deducted.
We reject this conclusion because it would once again shift to public entities the substantial burden of being subjected to the lien of the Workers' Compensation insurance carrier for benefits paid under Title 34, without any indication that the Legislature intended such a result. See N.J.S.A. 34:15-40(b). We have previously held that N.J.S.A. 59:9-2e prohibits the enforcement of such Workers' Compensation liens against public entities. See Ortega v. State, 213 N.J. Super. 16, 516 A.2d 258 (App.Div. 1986); Wunschel v. City of Jersey City, 208 N.J. Super. 234, 505 A.2d 204 (App.Div.), certif. denied, 104 N.J. 427, 517 A.2d 421 (1986); Kramer v. Sony Corp. of Am., 201 N.J. Super. 314, 493 A.2d 36 (App.Div. 1985); and The Travelers Ins. Co. v. Collella, 169 N.J. Super. 412, 404 A.2d 1250 (App.Div. 1979). These cases, decided and published prior to the enactment of N.J.S.A. 2A:15-97, made it clear that the Legislature intended that public entities were to be relieved of the burden of liens for Workers' Compensation benefits on the theory that the insurance industry was better able to carry this expense for which it had been paid a premium.
It appears that at the same time that the Legislature enacted N.J.S.A. 2A:15-97 (L. 1987, c. 326, § 1, eff. Dec. 18, 1987), two changes were also made in Title 59. Specifically, N.J.S.A. 59:9-3 (L. 1987, c. 324, § 2, eff. Dec. 18, 1987), was amended and N.J.S.A. 59:9-3.1 (L. 1987, c. 324, § 1, eff. Dec. 18, 1987) was enacted. N.J.S.A. 59:9-3, as amended, states the following:
Notwithstanding any other law, in any case where a public entity or public employee acting within the scope of his employment is determined to be a joint tortfeasor the public entity or public employee shall be required to contribute to a joint tortfeasor only to the extent of the recovery provided for under this act.
The Comment to N.J.S.A. 59:9-3 provides as follows:
The purpose of [former] subparagraph (a) is to make clear that in situations where a public entity or public employee is a joint tortfeasor and hence jointly and severally liable with any other tortfeasor to the injured party, the public entity's or *318 public employee's liability and duty of contribution only extends to the damages provided under the act. Thus the pro rata share for which an entity or employee is responsible in contribution must be determined in relation to the possible amount of recovery permitted in section 59:9-2 rather than in relation to the claimant's total judgment. To the extent that this provision is inconsistent with the "Joint Tortfeasors Contribution Law," N.J.S. 2A53-1 et seq., this act shall be controlling.

[Emphasis added.]
N.J.S.A. 59:9-3.1 states as follows:
Notwithstanding the provisions of P.L. 1952, c. 335 (C. 2A:53A-1 et seq.), P.L. 1973, c. 146 (C. 2A:15-5.1 et seq.) or any other law to the contrary, in any case where a public entity or public employee acting within the scope of his employment is determined to be a tortfeasor in any cause of action along with one or more other tortfeasors, the public entity or public employee shall be liable for no more than that percentage share of the damages which is equal to the percentage of the negligence attributable to that public entity or public employee and only to the extent authorized by N.J.S. 59:9-2 and N.J.S. 59:9-4.
The purpose of the legislation, as evidenced by the "Assembly Insurance Committee Statement" following N.J.S.A. 59:9-3.1, was to increase protection for public entities by limiting liability for them. It is unlikely that, on the same day the Legislature limited the liability of public entities, it would have intended to increase the exposure of public entities under N.J.S.A. 59:9-2e by the enactment of N.J.S.A. 2A:15-97, without even stating that it was doing so. Certainly, if N.J.S.A. 2A:15-97 were intended to result in an amendment to N.J.S.A. 59:9-2, the Legislature would have said so somewhere.
We hold that the collateral source law the Legislature intended to be applicable to public entities is controlled by Title 59, not Title 2A. Title 59 has been, for two decades, the exclusive structure used by our Legislature to determine liability against a public entity. N.J.S.A. 59:1-2, entitled "Legislative declaration," provides as follows:
The Legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that *319 might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration.
[Emphasis added.]
There is not a single reference to the Tort Claims Act in the legislative history of N.J.S.A. 2A:15-97. We would expect that such a significant change in existing law would be noted and debated. The purpose of N.J.S.A. 2A:15-97 was to prevent double recovery by the injured party in tort actions. This problem had already been addressed and resolved with respect to those persons making claims against public entities. N.J.S.A. 59:9-2. There is no evidence that the enactment was intended to benefit Workers' Compensation insurance carriers. Legislative contemplation of such an unlikely disadvantage to public entities should not be inferred absent clear statutory language. We, therefore, decline to so interpret N.J.S.A. 2A:15-97. Further, we do not anticipate that an injured plaintiff or a decedent's estate would benefit from the interpretation urged by appellant. There would be no net gain since the amount realized in avoiding the credit would be offset by the lien of the Workers' Compensation insurance carrier.

III
In Sikes v. Township of Rockaway, 269 N.J. Super. 463, 635 A.2d 1004 (App.Div. 1994), issued after the judge's decision here, we held that the deduction from the jury verdict of the payments plaintiff received from collateral sources must be calculated before the jury verdict is adjusted to reflect plaintiff's contributory negligence. Id. at 467, 635 A.2d 1004. Our holding in Sikes must be applied here so that any applicable credits are deducted from the gross jury verdict, and not from the verdict as reduced by decedent's comparative fault. This ruling makes the counsel fee issue moot as there will now be funds available from which a contingent fee may be paid.
*320 In addition, the appointment of a guardian ad litem is necessary to "represent the interests of the child." Jurman v. Samuel Braen, Inc. 47 N.J. 586, 602, 222 A.2d 78 (1966). The Jurman Court stated:
A guardian ad litem should be appointed to represent the interests of the child. The statute gives the court wide discretion in arriving at a fair and equitable apportionment geared to a particular family situation and the individuals involved. That discretion can only be properly exercised on the basis of facts, so full evidence should be presented on all aspects. We think it unwise now to comment further, beyond saying that the court's primary interest should be to assure the child's appropriate support and maintenance and that it undoubtedly has the authority to provide therefor as it deems best under the circumstances....
[Ibid. (emphasis added).]
A guardian ad litem should have been appointed prior to any application of credits which might affect the distributive shares of Megan Furey. A determination of the distributive shares should have been made here because "[t]he child's right to receive dependency payments is independent from the mother's." Brumfield v. Gallo Wine Sales of New Jersey, Inc., 183 N.J. Super. 159, 165, 443 A.2d 731 (App.Div. 1982). Therefore, every attempt must be made to protect the child's award from invasion by credits properly chargeable only against the widow's award.
We add that, at least in a wrongful death action, there may be a better method of handling the question of such credits where expert economist's testimony is presented at trial. The necessary proof as to such collateral benefits and their calculation as to present value could be presented directly to the jury so that the jury can determine the actual loss of income to the estate.
We further note that there are other obvious issues not raised in this appeal, such as whether post-verdict assessment of credits against a lump sum jury award will result in an invasion of the dependents' recovery for service, advice, consortium, and the like. These items of damages are unrelated to the award for loss of income against which benefits received from Workers' Compensation and Social Security sources should only be deducted. In such circumstances, the objective of preventing a double recovery is not *321 served and the deduction results in an injustice to the damaged party and a subverting of the jury award. We suggest that the procedural issues involved be considered by an appropriate Supreme Court practice committee.
Reversed and remanded.
NOTES
[1] Plaintiff has not appealed either the denial of her request for an additur, the denial of a new trial as to damages, or the credit allowed for Social Security benefits.