**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1951-24

PHILIP CARRINGTON,

    Plaintiff-Appellant,

v.

CITY OF JERSEY CITY and
WILLIAM O'DONNELL, Director,

    Defendants-Respondents,

and

STEVE FULOP, Mayor, CHRISTINE
GOODMAN, Director, JERSEY CITY
COUNCIL, JOYCE WATTERMAN,
DANIEL RIVEREA, AMY DEGISE,
DENISE RIDLEY, MIRA
PRINZ-AREY, RICHARD
BOGGIANO, YOUSEF J. SALEH,
JAMES SOLOMON, STACY
FLANAGAN, Director, and JOHN
METRO, Business Administrator,

    Defendants.

_____

Submitted March 10, 2026 – Decided April 6, 2026

Before Judges Gilson and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-0398-23.

Philip Carrington, self-represented appellant.

Sarah Levine, Corporation Counsel, attorney for respondents the City of Jersey City and William O'Donnell (Mailise Marks, Assistant Corporation Counsel, of counsel and on the brief).

PER CURIAM

Plaintiff Philip Carrington, self-represented, appeals from a January 27, 2025 order granting a directed verdict after the completion of his case pursuant to Rule 4:37-2(b) in favor of defendants the City of Jersey City (City) and William O' Donnell, and a March 20, 2025 order denying reconsideration of that order. We affirm.

I.

Plaintiff owns and operates a business on Martin Luther King Drive (MLK Drive) in Jersey City. In June 2022, he applied for a permit to hold the "Chocolate City Caribbean Festival 2022" (festival) on MLK Drive on July 23, 2022, and close a section of the road to vehicular traffic from 10:00 a.m. until 10:00 p.m. Plaintiff contends he was not permitted to hold his festival on MLK Drive for unlawful reasons, including racial and "bias" discrimination. On

2

January 30, 2023, he filed a complaint against defendants, alleging various claims.[1] Generally, that he

> found out that the purpose for the orders to close his event was, [plaintiff] is a Black man from Barbados that repeatedly oppose[d] Mayor [Steven] Fulop['s] improper action of wrongfully disrupting his business over the years and to prevent [p]laintiff from having his event on the same day the Mayor, Director [of the Jersey City Office of Cultural Affairs (Community Affairs), Christine] Goodman[,] and others w[ere] having a parade.

As to defendants, he alleged causes of action based on bias intimidation in violation of N.J.S.A. 2C:16-1, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50, fraud, breach of contract, and conspiracy to violate his civil rights in violation of 42 U.S.C. § 1981.

The court conducted a four-day jury trial in January 2025. Plaintiff testified and called O'Donnell and Goodman as witnesses in his case.

---

[1] Plaintiff named several other individuals and asserted additional claims against certain of them. His claims against those individuals were dismissed before trial. Plaintiff does not appeal from the order dismissing his claims against those individuals. His right to appeal from that order is, therefore, waived. See 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004) ("it is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review" (citation omitted)).

A-1951-24

Plaintiff testified that on June 6, 2022, he submitted his permit to conduct the festival. On July 13, he received an email from Leotis Clyburn, an employee of Community Affairs, advising him his application was "completed and . . . approved." That same day, he received a "street closing regulation" from the City, stating MLK Drive would be "temporarily closed to motor vehicle traffic" from 10:00 a.m. to 10:00 p.m. on July 23. On July 18, the City Department of Health and Human Services issued plaintiff a license for the festival.

On July 19, plaintiff received an email from Goodman advising him "the [festival] application has been denied by [the Department of] Public Safety. Your application has not been approved for Saturday, July 23, 2022." Goodman attached the City's "special event signature page" indicating the application was "not approved" by O'Donnell, who was then the Deputy Public Safety Director, on July 11. On July 20, plaintiff wrote to the City Corporation Counsel that he "received notification that [his] license was revoked" and "a portion of the [festival would] still go forward July 23[], 2022, on [his] private property" on MLK Drive.

Notwithstanding O'Donnell's July 11 decision not to approve plaintiff's application, on July 20, he "received . . . two truckloads of barricades" and on

4

July 21, he "received . . . no parking signs" from the City. On July 23, the Division of Commerce issued plaintiff a license for the festival. On July 23, plaintiff erected the barriers and blocked MLK Drive. Shortly thereafter, the Jersey City Police Department ordered him to remove the barriers because his application had been denied.

Plaintiff testified that "a portion" of the festival was held on his property, but "there[ is] a difference between a backyard party and a . . . block festival." He contended they "were unable to make the money that . . . [they] were expecting to get."

Plaintiff alleged "the fact is [he is] a [B]lack man, and he [thought he] did[ not] get to do the business that [he] had a license for just because he[ is] a [B]lack man." He alleged "discrimination based on [his] race." On cross-examination, plaintiff conceded his claim of race discrimination was "speculative." He also conceded he did not introduce any evidence "that showed, . . . calculated, or demonstrated what damages [he] suffered."

Plaintiff attempted to introduce evidence that O'Donnell approved two other events that took place on different sections of MLK Drive in July and August 2022, neither of which involved closing the road for twelve hours. The court sustained defendants' objection to the evidence because the events were

"so dissimilar that they [had] no relevance at all to the case" and, under N.J.R.E. 403, the probative value was substantially outweighed by the risk the jury would be "[v]ery confused." Specifically, the court determined the events were in "different area[s], which would necessarily involve different traffic patterns," and the events involved "about half of the time that [plaintiff] asked to shut [the street] down."

O'Donnell testified he did not approve plaintiff's application because MLK Drive is "a major thoroughfare for emergency vehicles . . . [and] it[ is] also a bus route." The application sought "to shut down [MLK] Drive between Union and Oak Street for a period of [twelve] hours" and

> we have a building on that corner. The address is 450 [MLK] Drive, which we have multiple . . . police, fire, and E[mergency] M[edical] S[ervices] calls to. Our concern was if we clogged that area up with traffic, we would not be able to get sufficient resources to that location in ample amount of time. So that delay was our main concern.
>
> . . .
>
> So now the bus routes, when you try to get those buses to turn on side streets, it[ is] very difficult, and that clogs up traffic very easily. . . . [T]hat[ is] where the delay will come in. . . . You have the buses trying to make the turn onto a side street that, with the traffic delineators and everything . . . , it[ is] very difficult for those buses to turn onto side streets. So they[ are] going to be turning onto that side street, which is going to

6

have a ripple effect on traffic everywhere else. . . . [He] did not feel safe closing that down and having a delay in emergency response time to that location, or any other location.

O'Donnell testified that he had never met plaintiff before he denied the application, and did not know what he looked like, his race, where he was born, or any "information about [him] whatsoever." His decision was made "purely for safety reasons."

Goodman testified that the role of Cultural Affairs in the application process is only to "receive the application and . . . circulate it via Docusign to all relative departments in the City." It "does not approve or deny any aspect of . . . applications for . . . special events." "Cultural Affairs cannot overrule Public Safety. They are the final decision on that matter."

Goodman testified that the July 13 email from Clyburn to plaintiff stating his application was approved was a "mistake." After that email "went out, it was noted that Public Safety had denied the permit. So [Goodman] immediately sent an email saying that the permit application had been denied by Public Safety to [plaintiff] . . . as soon as [she] was alerted to the issue."

After plaintiff rested, defendants moved for a directed verdict. The court permitted the parties an opportunity to submit briefs. When trial reconvened, the court heard oral argument on defendants' motion. After oral argument, the

court entered an order granting the motion supported by an oral opinion. It found:

> there is no evidence, zero, from which a rational jury can disbelieve . . . O'Donnell's explanation that the only thing motivating him was . . . that one potential senior citizen who might die because buses are stuck in a side street going around this festival[.] [F]or example, . . . the ambulance that[ is] supposed to get to 450 MLK [Drive] can[ not] get there because they[ are] stuck behind that bus, and that that was his only motivating factor for not approving this application on July 11[]. And there is no evidence from which any rational, reasonable jury could believe that . . . Goodman's July 19[] email, which made it plain as day to the plaintiff that he did not have approval, was not motivated by anything else other than catching the mistake that her employee made.

The court also concluded the alleged errors by the City

> could not have caused [plaintiff] any problems with the vendors that he lined up because he obviously would have had to line them up before . . . July 13[], and before he actually got the permit . . . on the morning of July 23[]. So even if you look at it like a contract case . . . if he did suffer any damages by having less vendors, it could not have been caused by the July 13[] mistake. It certainly could not have been caused after July 19[], because he was told, in no uncertain terms, he did[ not] have permission to use the street on July 19[].

The court further determined:

> there[ has] been no evidence from which a rational jury could even conclude how many vendors did not show up in [plaintiff's] yard, versus how many he represents

8

he could have had on the street. . . . So. . . even if this was[ not] just a discrimination case, there[ are] no damages that the plaintiff can claim . . . by arguing that he relied upon the mistaken July 13[] email, or the street closing regulation that he got the day before the event, or the license that he did[ not] get until the morning of the event, because his commitment to all of his other contractors would have . . . had to have been done well, well before that.

The court also concluded plaintiff's argument that he

was somehow damaged by relying upon the July 13[] email, or the street closing document of July 22[], or the license that was issued the morning of July 23[], cannot possibly carry any weight either for the reasons [the court] just said. They happened way too late to have caused him to suffer any of those types of damages.

Plaintiff moved for reconsideration. On March 20, 2025, the court entered an order denying the motion supported by a written opinion. This appeal followed.

On appeal, plaintiff argues: (1) "[i]t was wrong for the court to bully [p]laintiff at trial to change his complaint from demanding that . . . O'Donnell give an explanation for his inconsistent approvals and disapproval"; (2) "[t]he court bullied and compel[led] [plaintiff] to use the term of discrimination base[d] on skin color[,] . . . repeatedly failed to appreciate [his] significant evidence[,] . . . [and] rendered its decision on the false claim [the court]

9

engineered"; (3) individuals other than defendants "personally benefit[ted] from disrupting and arbitrarily closing [p]laintiff['s] Caribbean event"; and (4) O'Donnell's "action should be considered unethical." Plaintiff also asserts "[t]o avoid any further abuse of the court's resource[s]; this matter will be settle[d] and go away if . . . defendants answer . . . two questions" regarding the decision to "close his business."

## II.

We review de novo a motion for a directed verdict by applying the same standard as the trial court. See Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). "Although we defer to the trial court's feel for the evidence, we owe no special deference to the trial court's interpretation of the law." Lechler v. 303 Sunset Ave. Condo. Ass'n, 452 N.J. Super. 574, 582 (App. Div. 2017) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Pursuant to Rule 4:37-2(b), the applicable standard for assessing a motion for a directed verdict "is whether the evidence, together with legitimate inferences that can be drawn from it, could sustain a judgment in favor of the party opposing the motion." Furey v. Cnty. of Ocean, 273 N.J. Super. 300, 309 (App. Div. 1994). "This includes accepting as true all evidence supporting the

10

party opposing the motion and according that party the benefit of all favorable inferences, and if reasonable minds could differ, the motion must be denied." Ibid. (citing Dolson v. Anastasia, 55 N.J. 2, 5 (1969)). If "no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action," the trial court should grant defendant's motion. Smith, 225 N.J. at 397 (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

Based on our de novo review, we are convinced the court properly granted defendants' motion for a directed verdict. As the court correctly determined, plaintiff failed to offer any competent evidence from which a rational jury could conclude his application was denied based on race or any other type of "bias."

Plaintiff's contention that the court bullied him into changing his claim from one merely seeking an "explanation" from O'Donnell and "to use the term of discrimination base[d] on skin color" is directly contradicted by his complaint. Plaintiff specifically alleged "the closure was done to destroy [p]laintiff . . . because [he] is a Black man from Barbados" and sought "compensatory and punitive" damages.

We are unpersuaded by plaintiff's claim that the court improperly excluded evidence of other events on MLK Drive that O'Donnell approved. We

11

review a trial court's evidentiary decision for an abuse of discretion "because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). The trial court's evidentiary rulings are not disturbed unless "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

Here, the court concluded plaintiff failed to demonstrate the other events were substantially similar to his festival. Specifically, the events occurred on different sections of MLK Drive and did not involve the closure of the road for twelve hours. The court determined the evidence was not relevant as required by N.J.R.E. 401 and that any probative value was substantially outweighed by the risk of "confusion of issues" in accordance with N.J.R.E. 403(a). There is no basis for us to find the court misapplied its discretion by excluding evidence of other events.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley
Clerk of the Appellate Division

12                                                                          A-1951-24