777 A.2d 9

GERALDINE VINCITORE, ADMINISTRATRIX AD PROSEQUEN-
DUM OF THE ESTATE OF MICHAEL VINCITORE AND
GERALDINE VINCITORE, INDIVIDUALLY, PLAINTIFF–AP-
PELLANT, v. NEW JERSEY SPORTS AND EXPOSITION AU-
THORITY, DEFENDANT–RESPONDENT, AND NEW JERSEY
TRANSIT, ROBERT STOCKER, JOHN DOE, RICHARD ROE,
ABC CORPORATION, AND DEF CORPORATION, SAID
NAMES BEING FICTITIOUS, DEFENDANTS.

Argued January 30, 2001—Decided July 19, 2001.

*John M. Peduto* argued the cause, for appellant.

*John S. Fitzpatrick* argued the cause, for respondent (*Fitzpatrick, Reilly, Supple & Gaul,* attorneys).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal requires us to decide whether an unguarded railroad crossing through Monmouth Park Race Track was a "dangerous condition" under the New Jersey Tort Claims Act (Act). *N.J.S.A.* 59:4-2. After a verdict in favor of plaintiff, the Appellate Division reversed in an unpublished opinion, concluding that the crossing was not a "dangerous condition." We disagree, and therefore reverse.

I

The decedent, Michael Vincitore, was a former police officer who began training horses full-time after he retired from the Jersey City Police Department in 1978. He raced horses at various tracks, including Monmouth Park Race Track. Defendant, the New Jersey Sports and Exposition Authority (Authority), owns and operates the Track. In February 1995, Vincitore left his home to travel to the Race Track. The Track was closed for the off-season, but Vincitore needed to retrieve equipment he had left at the stables. Vincitore had been stabled there for approximately ten years. During that period, he previously had been to the Track during the off-season, but he was predominantly there during the racing season.

In order to reach the stables, Vincitore had to cross railroad tracks that run north to south across the Race Track grounds.

The tracks were not guarded by flashing lights or crossbucks. Instead, the Authority had installed sliding metal gates made of fencing on both sides of the tracks. Each gate was approximately 47 feet away from tracks. After retrieving his equipment, Vincitore drove through the first gate, which was open. At the same time, a train approached the crossing. The engineer, Robert Stocker, blew the whistle four times—two long, one short, and one long—for a total of approximately thirty seconds. He blew the last whistle just as he reached the crossing. Stocker had looked away for a few seconds, and when his eyes returned to the right, he saw Vincitore's car on the tracks. He and Vincitore made eye contact, and he saw that Vincitore had a puzzled look on his face. Despite Stocker's attempt to stop the train, it collided with Vincitore's car. Vincitore died from the injuries.

During the racing season, the gates were left open. When a train approached, a bell would ring in the guard shack and guards would close the gates. Approaching drivers would stop and wait for the guards to reopen the gates, which the guards would do after the train passed. During the off-season, there are no guards on duty. The record is unclear regarding how the crossing is regulated in the absence of guards. According to two of defendant's employees, the gates were generally locked. If someone needed to cross the tracks, he or she would seek out an employee of the Authority, who would open the gates. In contrast, Robert Juliano, the director of facilities for the Monmouth Park Race Track, and Robert Callan, the former director of security, testified that even in the off-season the gates were open during the day. At the end of the day shift, the track firemen were responsible for closing and locking the gates. The firemen would then open the gates the next morning. Despite the lack of clarity on that issue, it is undisputed that the gates were open at the time of the collision.

It is also unclear what safety precautions defendant took in the nonracing season concerning the crossing. Juliano testified that during the off-season defendant would place movable stop signs on

either side of the crossing in order to regulate traffic. Callan, however, testified that the stop signs were in place year round, during both the racing and nonracing seasons. There was also a permanent sign just off the roadway facing Vincitore that read "STOP USE CAUTION," and had a symbol for railroad crossing at the bottom.

After her husband's death, plaintiff, Geraldine Vincitore, filed a wrongful death action against the Authority, New Jersey Transit (Transit), and Stocker, the engineer. The Authority and Transit counterclaimed, alleging that Vincitore's estate was liable for damages he caused to the train. That counterclaim was later settled. After a bench trial, the court found the Authority liable, concluding that the railroad crossing was a "dangerous condition" under the Act. The court also found that Vincitore was comparatively negligent and reduced plaintiff's recovery by the percentage of fault attributed to Vincitore, 33%. *N.J.S.A.* 2A:15–5.2. The court found in favor of New Jersey Transit and Stocker.

The Authority appealed, and the Appellate Division reversed. That court, in a *per curiam* opinion, concluded that the railroad crossing was not a "dangerous condition," and, therefore, that plaintiff did not satisfy the requirements for the imposition of liability under the Act. We granted certification, 165 *N.J.* 603, 762 *A.*2d 218 (2000), and now reverse.

## II

### A.

■ Whether property is in a "dangerous condition" is generally a question for the finder of fact. *See Roe ex rel. M.J. v. New Jersey Transit Rail Operations, Inc.*, 317 *N.J.Super.* 72, 77–78, 721 *A.*2d 302 (App.Div.1998) (stating that whether property was in a "dangerous condition" was question for jury), *certif. denied,* 160 *N.J.* 89, 733 *A.*2d 494 (1999); *Daniel v. New Jersey Dep't of Transp.*, 239 *N.J.Super.* 563, 573, 571 *A.*2d 1329 (App.Div.) (same), *certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990); *Model Jury*

*Charges (Civil)*, § 5.18 (February 1996) (providing jury instruction regarding whether plaintiff established a "dangerous condition"). In the case of a bench trial, then, the question of whether property is in a "dangerous condition" ordinarily is for the trial court sitting as the finder of fact. However, "like any other fact question before a jury, [that determination] is subject to the court's assessment whether it can reasonably be made under the evidence presented." *Black v. Borough of Atl. Highlands*, 263 *N.J.Super.* 445, 452, 623 *A.*2d 257 (App.Div.1993). Thus, the critical question in this appeal is whether a reasonable factfinder could have concluded that plaintiff demonstrated that the property was in a "dangerous condition." *Daniel, supra*, 239 *N.J.Super.* at 573, 571 *A.*2d 1329 (holding that because reasonable jury could have reached a decision in favor of plaintiff, trial court properly allowed jury to consider public entity's liability under the Act).

### B.

In *Willis v. Department of Conservation & Economic Development*, 55 *N.J.* 534, 264 *A.*2d 34 (1970), we abrogated the common-law doctrine of sovereign immunity from tort liability. The Legislature responded by enacting the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, which reestablished the general rule of immunity but created narrow exceptions to that rule. *N.J.S.A.* 59:1–2; *see generally* Margolis & Novack, *Claims Against Public Entities*, comment on *N.J.S.A.* 59:1–2 (2001) (discussing purpose of the Act). We are now required, once again, to interpret one of those exceptions, *N.J.S.A.* 59:4–2.

*N.J.S.A.* 59:4–2 provides:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

[*N.J.S.A.* 59:4-2].

Thus, in order to impose liability on a public entity pursuant to that section, a plaintiff must establish the existence of a "dangerous condition," that the condition proximately caused the injury, that it "created a reasonably foreseeable risk of the kind of injury which was incurred," that either the dangerous condition was caused by a negligent employee or the entity knew about the condition, and that the entity's conduct was "palpably unreasonable." *Ibid.*

Central to this dispute is the definition of "dangerous condition." The Act defines "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4-1a. We recently addressed the meaning of "due care" in *Garrison v. Township of Middletown*, 154 *N.J.* 282, 712 *A.*2d 1101 (1998). In *Garrison*, the Court concluded that "due care" requires analysis of the "objectively reasonable" conduct of those who use the property. The Court stated:

"[U]sed with due care" implies a standard of objective reasonableness. A use that is not objectively reasonable from the community perspective is not one "with due care." To this extent, "used with due care" refers not to the conduct of the injured party, but to the objectively reasonable use by the public generally.

[*Id.* at 291, 712 *A.*2d 1101.]

Thus the standard is whether any member of the general public who foreseeably may use the property would be exposed to the risk created by the alleged dangerous condition. The Court further concluded that the "due care" inquiry must also consider the activity in which the plaintiff engaged. The purpose of the evaluation is to ascertain whether the plaintiff had engaged in an activity that is so objectively unreasonable that liability for resulting injuries may not be attributed to the

condition of the property. The focus of the inquiry is not on the details of the plaintiff's activity, but on the nature of the activity itself.

[*Id.* at 292, 712 *A*.2d 1101.]

In the context of Garrison's claim, then, the question was

whether the declivity in the parking lot created a substantial risk of injury when the property was used with due care. So stated, our analysis focuses not on plaintiff's individual conduct, but on whether playing night football on a paved parking lot with a known declivity constitutes a use of the property with the care that was due.

[*Id.* at 287, 712 *A*.2d 1101.]

After the Court concluded that the declivity was not dangerous to all foreseeable users, it stated, "Furthermore, that plaintiff's use was not 'with due care' is manifest. Touch football on a poorly-lit uneven railroad-station parking lot constitutes a use of public property that is as a matter of law 'without due care.' " *Id.* at 293, 712 *A*.2d 1101.

*Garrison* thus describes a three-part analysis. The first consideration is whether the property poses a danger to the general public when used in the normal, foreseeable manner. The second is whether the nature of the plaintiff's activity is "so objectively unreasonable" that the condition of the property cannot reasonably be said to have caused the injury. The answers to those two questions determine whether a plaintiff's claim satisfies the Act's "due care" requirement. The third involves review of the manner in which the specific plaintiff engaged in the specific activity. That conduct is relevant only to proximate causation, *N.J.S.A.* 59:4–2, and comparative fault, *N.J.S.A.* 59:9–4. *Id.* at 292, 712 *A*.2d 1101.

Following that approach, the *Garrison* Court first analyzed whether the declivity in the parking lot posed a substantial risk of harm to members of the general public who normally used the lot, i.e., "commuters or ... other persons who parked their cars or walked to the train station." *Id.* at 293, 712 *A*.2d 1101. The Court then determined whether the nature of plaintiff's activity, "[t]ouch football on a poorly-lit uneven railroad-station parking lot," was without due care. *Ibid.* Because the record did not demonstrate that the declivity posed a risk to the general public,

and because playing football on the lot was "so objectively unreasonable" that it could not be said that the declivity caused the injury, the Court concluded that the grant of summary judgment to the defendant was proper. *Ibid.* Based on that conclusion, the majority had no need to analyze whether the manner in which Garrison played the game of touch football, that is, whether the specific actions he took as he played were unreasonable, because that question was relevant to proximate cause and comparative fault only, and was irrelevant to "due care."

## III

In this case, the trial court reasonably could have concluded that the railroad crossing posed a danger to objectively reasonable members of the general public who normally use the crossing. In this case the people who normally use the crossing are the men and women who work or have other business at the stables, just as the "objectively reasonable general public" in *Garrison* consisted of train commuters who regularly used the parking lot at issue in that case. Any Race Track patron or employee, familiar with the operation of the gates during the racing season, could have understood the open gates to constitute a signal that it was safe to cross. Such a driver very well could have proceeded across the tracks, reasonably relying on that interpretation, and found himself or herself on the tracks as a train approached. Thus, an objectively reasonable member of the general public that used the railroad crossing would have been subject to the same substantial risk that plaintiff faced.

The trial court also reasonably could have concluded that the nature of the decedent's activity was not so egregiously unreasonable that the injury had little or nothing to do with the condition of the property. Vincitore merely was driving across the tracks, which is exactly why the crossing was built. This is not a case like *Garrison*, in which the plaintiff was playing touch football at night on a municipal parking lot that was intended to provide train patrons with parking. Thus, it reasonably can be said that the

condition of the property caused the accident. This appeal is unlike *Garrison,* in that the nature of the plaintiff's activity here was easily foreseeable. Vincitore drove across the tracks at a crossing designed for that purpose.

The record does not disclose whether the stop sign was at the crossing all year or whether it was present only during the off-season. That factual dispute, however, does not alter our conclusion. Whether Vincitore stopped at the stop sign does not relate to the nature of the activity in which he was engaged—crossing the tracks. It pertains instead to the manner in which he engaged in that activity. Thus, those facts are relevant to proximate causation and comparative fault only. See *N.J.S.A.* 39:4–127.1 (requiring drivers to stop at railroad crossings and ensure that it is safe to proceed in certain circumstances); *Eaton v. Eaton,* 119 *N.J.* 628, 642–43, 575 *A.*2d 858 (1990) (noting that violation of motor vehicle statute is either evidence of negligence or negligence *per se* ). Neither of the trial court's decisions on those issues is challenged here.

In reaching its conclusion, the Appellate Division relied on two cases that addressed the issue of whether a railroad crossing is a "dangerous condition" under the Act. *Lopez v. New Jersey Transit,* 295 *N.J.Super.* 196, 684 *A.*2d 986 (App.Div.1996); *Hawes v. New Jersey Dep't of Transp.,* 232 *N.J.Super.* 160, 556 *A.*2d 1224 (Law Div.), *aff'd o.b.,* 232 *N.J.Super.* 159, 556 *A.*2d 1224 (App.Div. 1988). In *Hawes,* the plaintiff's decedent was struck and killed by a train when walking across the tracks. The plaintiff filed suit, alleging liability under the Act. The defendants, New Jersey Transit and the New Jersey Department of Transportation, moved for summary judgment contending that the crossing was not a "dangerous condition." The Law Division granted that motion:

[I]t is clear to this Court that if a person were to use the defendant's property with due care, he would encounter no substantial risk of harm. Common sense dictates that a person using due care would make certain no trains were approaching before walking across a railroad track. Exercising even a minimum of care, a person should be able to eliminate any chance of being hit by a train. Accordingly, NJT's property did not constitute a dangerous condition.

[*Id.* at 164, 556 *A.*2d 1224.]

Similarly, in *Lopez,* the plaintiffs' decedent was hit by a train and killed while attempting to walk across railroad tracks. The decedent and two friends crossed the tracks intending to climb a wall on the far side and slide down an adjacent light pole. The decedent became scared when the train approached and tried to run back across the tracks, where he was struck and killed by the train. The Appellate Division held that the property was not in a dangerous condition, and affirmed the grant of summary judgment. *Lopez, supra,* 295 *N.J.Super.* at 199, 684 *A.*2d 986.

In this case, the Appellate Division concluded, based on *Hawes* and *Lopez,* "that the objectively reasonable general public would be expected to cross railroad tracks without incident." However, the Appellate Division overlooked critical distinctions between this case and *Hawes* and *Lopez.* In this case, the objectively reasonable general public, familiar with the operation of the gates at the crossing, could have approached the crossing and interpreted the open gates to mean that it was safe to cross. In *Hawes* and *Lopez,* the decedents were not reasonably relying on a belief, based on the defendants' prior operation of the crossing, that it was safe to cross. Further, the decedents in those cases were on foot. Vincitore was driving an automobile. It is much more likely that the driver of a car, traveling at a speed well in excess of foot speed even after he or she slows down for a crossing, could be caught off guard and find himself or herself in the path of an oncoming train. It is also much more likely that a driver of an automobile, who on a winter's day is highly likely to have the windows rolled up, would not hear an oncoming train. Thus, this case is distinct from *Hawes* and *Lopez.*

■ In summary, a reasonable factfinder could have concluded that the railroad crossing here exposed the objectively reasonable member of the general public to a substantial risk of injury. The same factfinder could also have concluded that Vincitore's activity, driving across the tracks, was not so objectively unreasonable that the activity rather than the condition of the crossing was responsi-

ble for the collision. Therefore, the Law Division reasonably found that the property "create[d] a substantial risk of injury when . . . used with due care." *N.J.S.A.* 59:4–1a.

## IV

We agree with the Appellate Division that *N.J.S.A.* 48:12–84, relied on by the trial court, is inapposite. Enacted during the time of contributory negligence, that statute provides that a person may assume that safety gates at a railroad crossing are operational, such that the failure of the person to "stop, look and listen" before crossing shall not bar a subsequent action for injuries. *Ibid.* The Authority undertook the obligation to maintain the crossing pursuant to a lease with New Jersey Transit, which is explicitly exempt from *N.J.S.A.* 48:12–84. *N.J.S.A.* 27:25–8. As the Appellate Division correctly reasoned, "[i]f the statute would not apply to the particular railroad company here, we cannot see how it could apply to a lessee of that company's property."

In light of our conclusion, we need not determine whether plaintiff satisfied the additional requirements of *N.J.S.A.* 59:4–4, commonly known as the "trap liability" provision of the Act. We do address briefly defendant's other contention based on the Act, that plaintiff failed to demonstrate palpably unreasonable conduct, *N.J.S.A.* 59:4–2. Palpable unreasonableness is a question of fact. *See Furey v. County of Ocean,* 273 *N.J.Super.* 300, 313, 641 *A.*2d 1091 (App.Div.), *certif. denied,* 138 *N.J.* 272, 649 *A.*2d 1291 (1994). As we have said, the railroad crossing was a dangerous condition. The Authority knew of the risk, knew that having guards operate the gate eliminated that risk, and knew that people who ordinarily traversed the crossing during the racing season likely would have believed that open gates meant it was safe to proceed. Based on those factors, the Law Division reasonably could have concluded that the Authority acted in a palpably unreasonable manner.

■ Defendant also raises several issues regarding damages that the Appellate Division did not address in light of its reversal. We do not decide those issues, and instead leave them to the Appellate Division on remand. We do, however, pause to note that the Authority's contention that it was entitled to the maximum worker's compensation credit allowed by law, rather than the amount actually received in settlement, appears contrary to the principles espoused in *Parker v. Esposito*, 291 *N.J.Super.* 560, 566–67, 677 *A.*2d 1159 (App.Div.), *certif. denied*, 146 *N.J.* 566, 683 *A.*2d 1162 (1996) (holding that the phrase "if a plaintiff ... is entitled to receive benefits" in the collateral source statute, *N.J.S.A.* 2A:15–97, "refers only to those benefits to be paid post-judgment to which plaintiff has an established, enforceable legal right when judgment is entered and which are not subject to modification based on future unpredictable events or conditions," such that "future collateral benefits are deductible only to the extent that 'they can be determined with a reasonable degree of certainty' ") (quoting *Buchman v. Bd. of Educ.*, 73 *Ohio St.*3d 260, 652 *N.E.*2d 952, 958 (1995)). The intent of the Act's collateral source statute is to eliminate double recovery. *Ayers v. Township of Jackson*, 202 *N.J.Super.* 106, 126, 493 *A.*2d 1314 (App.Div.1985), *aff'd in part and rev'd in part*, 106 *N.J.* 557, 612, 525 *A.*2d 287 (1987). We are hard pressed to foresee how the statute should be interpreted to provide credits to defendants for moneys plaintiffs may not receive. Such a rule seemingly also would discourage plaintiffs from settling worker's compensation claims for anything less than the full amount recoverable under the law, contrary to our strong policy in favor of settlement. See *Nolan ex rel. Nolan v. Lee Ho*, 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990); *Jannarone v. W.T. Co.*, 65 *N.J.Super.* 472, 476, 168 *A.*2d 72 (App.Div.) ("[S]ettlement of litigation ranks high in our public policy."), *certif. denied sub nom.*, *Jannarone v. Calamoneri*, 35 *N.J.* 61, 171 *A.*2d 147 (1961). Finally, there is some inconsistency in the record regarding the amount of the worker's compensation settlement. Should the Appellate Division conclude that defendant is entitled to a

credit for the amount actually received, a remand to the trial court appears necessary to remedy the inconsistency.

Defendant also claims that plaintiff, who worked as the bookkeeper for Vincitore's horse training business, is not entitled to lost wages she sustained as a result of the fact that the business is no longer in operation after Vincitore's death. We do not pass on that claim either, but we do note its apparent inconsistency with the purpose behind the Wrongful Death Act, specifically *N.J.S.A.* 2A:31–5. See *Thalman v. Owens–Corning Fiberglas Corp.*, 290 *N.J.Super.* 676, 683, 676 *A.*2d 611 (App.Div.1996); *Hudgins v. Serrano*, 186 *N.J.Super.* 465, 478, 453 *A.*2d 218 (App.Div.1982).

We do conclude, as did the Appellate Division, that there appears to be an inconsistency between the present value calculations in the personal injury jury charge effective at the time of trial and the wrongful death jury charge. After the Appellate Division determines the remaining damages issues, a remand to the trial court will be necessary to determine, using expert testimony if necessary, the proper calculation of present value. We also refer the issue to the Committee on Model Civil Jury Charges to eliminate any discrepancy that may exist between the current forms of those charges.

Reversed and remanded for further proceedings consistent with this opinion.

STEIN, J., concurring.

I concurred in *Garrison v. Township of Middletown*, 154 *N.J.* 282, 295–312, 712 *A.*2d 1101 (1998), because I disagreed with the Court's holding that "a condition of public property is not dangerous unless the specific plaintiff that brought the litigation satisfies the 'threshold requirement' that he or she used due care when encountering the property." *Id.* at 295, 712 *A.*2d 1101. (Stein, J., concurring). Because I do not read the Court's opinion in this appeal to rest on the application of that aspect of *Garrison* with which I disagreed, I join in the Court's thoughtful and persuasive opinion.

COLEMAN, J., dissenting.

I would affirm the judgment dismissing the complaint substantially for the reasons expressed by the Appellate Division in its well-reasoned opinion. I write separately to state why I believe the majority has misapplied our recent decision in *Garrison v. Township of Middletown*, 154 *N.J.* 282, 712 *A.*2d 1101 (1998). Unlike the majority, I conclude that the Elkwood railroad crossing did not constitute a "dangerous condition" within the meaning of the Tort Claims Act, *N.J.S.A.* 59:4–2 (Act).

To recover under the Act, a plaintiff must prove, among other things, that at the time of the injury the public entity's property was in a dangerous condition, that the condition created a foreseeable risk of the kind of injury that occurred, and that the dangerous condition proximately caused the injury. *N.J.S.A.* 59:4–2. Even if each of the above elements is proven, the Act imposes no liability on a public entity "if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable." *Ibid.*

Essential to the determination of a public entity's tort liability is the definition of the statutory phrase "dangerous condition." The Act defines a "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a. Thus, by its very terms, the Act explicitly requires that a dangerous condition can be found to exist only when the public entity's property "is used with due care." Hence, the real question in this case is whether permitting people to use a flat railroad crossing without operational safety gates created a substantial risk of injury when the property was used with due care. The phrase "due care" in the context of this case focuses first on the threshold determination of whether the public entity's property was in a dangerous condition.

In *Garrison, supra,* 154 *N.J.* at 293–94, 712 *A.*2d 1101, the Court held that for purposes of the public entity's liability under the Act, a condition of the public property is not dangerous unless

the specific plaintiff who brought the action, as opposed to the generic class of potential plaintiffs, satisfies the threshold requirement that he or she used due care in a reasonably foreseeable manner when encountering the property.

When the property poses a danger to all users, an injured party may establish that the property was in a dangerous condition notwithstanding his or her failure to exercise due care. In that case, the plaintiff's negligence does not relate to due care but rather to issues of proximate cause or comparative negligence. Unless the property can be said to pose a danger to all users, courts must first concentrate on the activity in which the plaintiff engaged. The purpose of the evaluation is to ascertain whether the plaintiff engaged in an activity that is so objectively unreasonable that liability for resulting injuries may not be attributed to the condition of the property. As we observed in *Garrison*, "[t]he focus of the inquiry is not on the details of the plaintiff's activity, but on the nature of the activity itself." *Id.* at 292, 712 *A.*2d 1101.

Application of the *Garrison* principles to this case leads me to conclude that the record does not establish that the Elkwood unguarded railroad crossing was a dangerous condition to all users. The crossing was visible for some distance—it was flat with unobstructed view in both directions. The accident occurred on a clear day. There was at least one sign posted stating "Stop use caution." The train that struck decedent sounded audible warnings before the accident. In light of those facts, the conclusion "that plaintiff's use was not 'with due care' is manifest." *Id.* at 293, 712 *A.*2d 1101. The decedent's failure to yield to a clearly visible train that was sounding audible warnings was so objectively unreasonable that the condition of the property cannot reasonably be said to have caused the injury. The crossing was safe when used with due care, and the risk of harm was created only when foreseeable users failed to exercise due care. *Id.* at 290, 712 *A.*2d 1101. I agree with *Hawes v. New Jersey Dep't of Transp.,* 232 *N.J.Super.* 160, 556 *A.*2d 1224 (Law Div.), *aff'd,* 232 *N.J.Super.* 159, 556 *A.*2d 1224 (App.Div.1988), and *Lopez v. New Jersey*

*Transit,* 295 *N.J.Super.* 196, 684 *A.*2d 986 (App.Div.1996), that the objectively reasonable member of the public is expected to cross railroad tracks without incident. I also agree with the Appellate Division in this case that this should particularly "be so when the train is visible, sounding audible warnings and the crossing contains both a stop sign and a caution sign. Proceeding in the face of these circumstances does not bespeak use of the property with due care."

I would therefore affirm the judgment of the Appellate Division.

*Justice LaVecchia joins in ths opinion.*

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, LONG, VERNIERO and ZAZZALI—5.

*Dissenting*—Justices COLEMAN and LaVECCHIA—2.