867 A.2d 1236

MADHAVI PANDYA, AS ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF ANKIT S. PANDYA; MADHAVI PANDYA, INDIVIDUALLY; HARIVADAN C. PATEL AND DEVSMITA H. PATEL, AS ADMINISTRATORS AD PROSEQUENDUM AND GENERAL ADMINISTRATORS OF THE ESTATE OF DHAVAL PATEL; BHARAT PATEL AND FALGUNI PATEL, INDIVIDUALLY; MANHAR PATEL AND MINA PATEL, AS ADMINISTRATORS

AD PROSEQUENDUM AND GENERAL ADMINISTRATORS OF THE ESTATE OF CHIRAG PATEL; MANHAR PATEL, INDIVIDUALLY; MINA PATEL, INDIVIDUALLY; AND PALLAVI ZALAWADIA, PLAINTIFFS–APPELLANTS, v. STATE OF NEW JERSEY AND DEPARTMENT OF TRANSPORTATION, DEFENDANTS–RESPONDENTS, AND JOSE MARTIN MATAMOROS; TOBY HANNA CORPORATION; AND MARK R. FARLEY, DEFENDANTS.

ESTATE OF RAHUL PATEL, BY HIS ADMINISTRATOR AD PROSEQUENDUM JIGAR PATEL, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 30, 2004—Decided February 28, 2005.

Before Judges KESTIN, ALLEY and FUENTES.

*Kenneth S. Javerbaum* argued the cause for appellants in A–0813–03T2 (*Javerbaum, Wurgaft, Hicks & Zarin,* attorneys; *Mr. Javerbaum,* on the brief).

*Weiseman Hely DiGioia,* attorneys for appellants in A–0957–03T2, join in the brief of appellants in A–0813–03T2.

*Karen L. Jordan,* Deputy Attorney General, argued the cause for respondents (*Peter C. Harvey,* Attorney General, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Ms. Jordan,* on the brief).

The opinion of the court was delivered by

ALLEY, J.A.D.

The appeals in these consolidated cases arise out of a horrific October 2000 accident on Route 7 in Jersey City that killed four persons: Rahul Patel (Rahul), the driver of a vehicle that crossed over into the oncoming traffic, and three of Rahul's four passengers. The surviving passenger, the estates of all of the deceased passengers, and their interested relatives (collectively, the Pandya plaintiffs) filed a complaint against the State of New Jersey and New Jersey Department of Transportation (collectively, DOT) and others who are not involved in the appeal. Rahul's estate filed a separate action against the DOT, and the matters were consolidated.

On April 15, 2003, the DOT filed a motion for summary judgment. The Pandya plaintiffs filed voluminous documentation in opposition and Rahul's estate filed a cross-motion seeking to strike the DOT's defense asserting immunity under *N.J.S.A.* 59:4–5. On July 3, 2003, the trial judge entered orders granting summary judgment in favor of the DOT and denying the cross-motion. On August 5, 2003, the judge issued a written opinion on the motions and entered an amended final order on September 23, 2003.

The Pandya plaintiffs appealed in A–813–03T2, and the Rahul estate appealed in A–957–03T2; the appeals were subsequently consolidated. Because the Rahul estate has joined in the brief of

the Pandya plaintiffs, we use "plaintiffs" to refer to both sets of plaintiffs, collectively, in this opinion.

We reverse and remand, because of the existence of a genuine issue of material fact precluding summary judgment with regard to the DOT's entitlement to immunity under the Tort Claims Act, *N.J.S.A.* 59:4–5.[1]

The stretch of highway where the accident occurred is known as Route 7 in Jersey City (formerly known as Route 10 and sometimes referred to as Newark Avenue), just west of the Charlotte Circle and approaching the Wittpen Bridge over the Hackensack River. (We will sometimes refer to it as the "roadway.") The Charlotte Circle was within three-tenths of a mile of the Wittpen Bridge. The westbound portion of the roadway had a rightward curve with a rising grade, just prior to the beginning of the bridge elevation.

The State became the owner of the roadway in about 1929 and its width, grade, curvature, and curbing design were set forth in plans dated May 10, 1937, and approved by the State Highway Commissioner. Plans dated February 13, 1956, and May 31, 1973, showed the roadway, as built, as part of repaving or resurfacing projects, respectively, but no detail about the roadway appears from those documents in the record.

The record contains Plans C–2A, C–3A and C–4A, which are all dated February 4, 1998, and which showed the roadway with two westbound lanes as it existed prior to the accident involved here.

---

[1] On July 31, 2001, the Pandya plaintiffs filed their complaint against the DOT and the drivers of the other two vehicles, Mark R. Farley and Jose Martin Matamoros, and the owner of the truck driven by Matamoros, Toby Hanna Corporation. Matamoros was never served and Toby Hanna Corporation defaulted. Farley participated in the litigation but did not counterclaim against Rahul's estate; the summary judgment dismissing the claims against Farley has not been challenged on appeal. The DOT filed a third party complaint against Rahul's estate.

On October 2, 2001, Rahul's estate filed a separate wrongful death and survival action against the DOT. In August 2002, this complaint was consolidated with the Pandya complaint.

Those February 1998 plans were drawn as part of a DOT project to work to reconstruct the Wittpen Bridge and to change the Charlotte Circle. The DOT planned to build a new bridge, and upon its completion, the old bridge would be demolished. The approach roadway would also need to be realigned. This construction was not yet underway as of October 2000.

The record does not show, however, whether a plan was ever approved for the roadway that affirmatively embodied a design using two lanes of westbound travel through the curve. None of the drawings from 1937, P–5A, P–5B or P–5C, showed two lanes of travel for the roadway. The DOT's legal liaison Patrick Weber believed that he had seen plans that showed the "striping plan" for that roadway, meaning how the lane markings on the roadway would be painted, but he agreed that the striping plans prior to the accident were not in the 1937 drawings. Richard Dunne, the DOT's Director of Design Service and Deputy State Transportation Engineer, recalled reviewing plans from between the 1930s and 1970s that showed two lanes of westbound travel on the roadway, but he could not identify the plans more specifically.

DOT had taken "photo logs" of this area of the roadway on September 12, 2000, as a record of its appearance. These photo logs showed that there were two westbound lanes of travel on the roadway, marked by a painted broken line dividing the two lanes.

The record also contains a drawing showing a striping plan for the Charlotte Circle on the approach to the Wittpen Bridge, Routes 7, 1 & 9, sometimes referred to in the record as P–5D, as originally drawn on September 25, 1984, by "A. Bernhard" of the DOT's Traffic Bureau, and revised on May 14, 1986, and August 11, 1987, as listed in the box for revision entries on the drawing form (the 1984–87 drawing). That drawing showed one lane of traffic at the curve where Route 7 begins its approach to the bridge, and becoming two lanes of traffic over the bridge. No one ever explained why this document was drawn or whether it was ever approved, but it does not appear to have been implemented any time prior to October 9, 2000. Richard Eng, a DOT Project

Engineer who made the May 14, 1986, revision to the 1984–87 drawing, did not recall why the plan was drawn. Chester J. Lyszczek, the DOT's Executive Director of North Regional Operations having responsibility for maintenance of Route 7 in Jersey City at the time of the collision, was considered the most knowledgeable person at the DOT regarding the conditions on the roadway. Lyszczek had not been involved in responding to the discovery requests for plans regarding the roadway, and when shown the 1984–87 drawing, he responded that he did not know about any other plans for that area in effect prior to October 9, 2000.

At about 1:00 a.m. on October 9, 2000, approximately twelve hours prior to the accident involving the victims in these appeals, a separate accident occurred on the roadway. Weather conditions were clear, cold, and dry. A Nissan car driven by Catarina A. Luz was in the left lane of the two westbound lanes of Route 7, coming around the curve toward the bridge. Luz lost control of the vehicle and began to "fishtail," crossing the double yellow lines and entering the left lane of the two eastbound lanes of Route 7. Gary W. Gerwer was driving a Mack garbage truck traveling downhill on the bridge in the left eastbound lane when he observed the car fishtail and then begin to straighten out. Despite braking and veering to the right, Gerwer was unable to prevent the truck from colliding with the car. Neither Gerwer nor his passenger, Shaun Brandon, was injured, but Luz died at the scene, her vehicle having been crushed under the truck. Gerwer estimated that the Nissan and truck speeds prior to the collision were fifty-five and thirty-five miles-per-hour respectively. Brandon estimated them as sixty miles-per-hour for the Nissan and forty-five miles-per-hour for the truck. According to Gerwer, who regularly traveled on westbound Route 7 on his way to work, there was a dip in the westbound curve that could have caused Luz's vehicle to fishtail, and excessive speed could cause a driver to lose control in the dip.

The details concerning the fatal accident in suit, which occurred later on October 9, 2000, were these. Ankit S. Pandya, Dhaval Patel, Chirag Patel, and Pallavi Zalawadia, all Jersey City residents, entered Rahul's red Toyota vehicle to travel with him to Newark. Rahul and Zalawadia, who were college students at NJIT, and Pandya, a Rutgers student, were on their way to afternoon classes. Dhaval and Chirag Patel were high school seniors who planned to spend the Columbus Day holiday on campus with the others. Zalawadia had ridden with Rahul to classes about once a week since September, when the semester had started. Once or twice they traveled via Route 7; on the other trips they took the Pulaski Skyway route. Zalawadia was the last passenger to be picked up on October 9, entering the vehicle at about 12:35 p.m.

At about 12:44 p.m., Rahul's vehicle was traveling on the westbound portion of the roadway; the speed of his vehicle is unknown. According to Farley, traffic was "light" but the record does not disclose whether other vehicles were traveling near Rahul's vehicle in the westbound lanes as he passed through the curve toward the bridge. At that point, Rahul lost control of his vehicle, and the vehicle struck the northern curb in the right westbound lane. The vehicle then skidded across the center line into the eastbound lanes of traffic, where it struck the driver's side front door of Farley's Toyota Camry traveling in the right eastbound lane. Rahul's car ricocheted back into the left eastbound lane where it was struck by the tractor-trailer truck driven by Matamoros. Matamoros had seen Rahul's vehicle entering his lane of travel and applied the brakes, but he was unable to stop in time. Zalawadia and Chirag were taken to the hospital with injuries, but only Zalawadia survived; Rahul and the other two passengers died at the accident scene.

According to Sergeant Bart De Cresce, the police officer who supervised the investigation of this accident, Rahul's vehicle crossed into the eastbound lanes "just about at the end of" the

curve in the roadway. In De Cresce's view, Route 7 had "been a problem with a lot of accidents on that roadway."

Lyszczek and his supervisor went to the site a few days later; because it was unusual to have two fatal accidents at the same location so close in time, they wanted to examine how to improve conditions. Lyszczek's maintenance unit was responsible only to "replace in kind," and if a change appeared warranted, Lyszczek was to bring it to the attention of the DOT's design unit. Lyszczek had responsibility for minimizing disruptions to traffic flows, and was not involved in determining causes of traffic accidents. He did not consider himself qualified to determine whether something represented a dangerous condition. Lyszczek saw two westbound lanes of traffic marked on the roadway, and recommended changing the traffic pattern from two lanes to one. He endorsed approving the expenditure to change the roadway to one lane because he thought it was a better design, which would increase the traffic flow and "[i]nherently one lane is always safer because you take away one movement from people[.]"

On October 12, 2000, Lyszczek and other DOT officials met with Jersey City Mayor Bret Schundler to discuss plans for improving safety on the Route 7 approach to the Wittpen Bridge. A long list of planned changes was outlined in a meeting on October 16, 2000. Consistent with the direction given him at that meeting, Dhanesh Motiani, a DOT Traffic Engineer, prepared striping and pavement marking plans. Motiani later certified that, to his knowledge, "these were the only approved plans affecting the westbound travel lanes around the Charlotte Circle."

When the recommended changes were implemented, the markings on Route 7 were altered so that there was only one lane of travel in the curved part of the roadway prior to the bridge elevation. The highway was resurfaced so that the new painting would not be confused with the prior two-lane painting. A striped gore was painted in the center of the roadway, separating the opposing lanes of traffic, and placed in the middle of that gore was a "Jersey barrier" curb, a concrete structure designed to redirect

a vehicle to remain on its side of the highway, aimed at avoiding crossover accidents. "Rumble strips" were also cut into the pavement in the median area approaching the bridge, so that drivers crossing into the median would be alerted by the noise created when a vehicle drove onto the strips. Vegetation was cleared along the side of the road from the Tonnelle Avenue Circle to the Charlotte Circle, raised markers were installed in the roadway, and reflectors were installed along the Route 7 guardrail. These changes were made at an extra project cost of $77,936, authorized for payment out of accounts under Lyszczek's control. DOT correspondence seeking approval for making this expenditure on an emergency basis indicated that a "dangerous safety condition exists" on the roadway.

According to Lyszczek, all of the foregoing changes occurred at a point along Route 7 that was further east of the spot where Rahul's vehicle actually crossed over the center line on the highway; the crossover point was closer to where the bridge elevation began.

Thomas Saylor, a supervising engineer in the DOT's Bureau of Project Scope Development, was assigned in 1999 to the highway reconstruction project for building a new bridge. According to Saylor, the DOT's roadway standards included a minimum lane width of ten feet, although a width of at least twelve feet was desired (but not required) for modern designs, recognizing the larger size of many newer vehicles. Because Route 7 was twenty feet wide at the portion of the highway involved here, it was significant that a drawing should show "where the striping is" because there was a potential for two ten-foot wide lanes.

A computer printout was generated showing motor vehicle accidents on Route 7 between mileposts 0.300 and 0.500 between January 1, 1997, and December 31, 2000. This three-page document listed accidents and various information about them, grouped as of milepost number. The first, listed at milepost 0.30 is labeled "near Wittpen Bridge," and similar descriptions appeared for some of the others up to and including one at milepost 0.41. It is

hard to tell from this document how complete it is; it appears to show only one of the October 9, 2000, accidents and inaccurately counts the number of victims. For some accidents, a reason is given, such as "Dri Inattention" or "Failure to Yld ROW"; others indicate only "None" or "Other."

Plaintiffs also gathered some newspaper articles discussing the Luz and Rahul accidents and other accidents on Route 7, but the other accidents involved other parts of the highway and included instances of driver fault.

Ira S. Kuperstein, plaintiffs' expert in engineering, provided a report dated October 29, 2002. He noted that Rahul's vehicle followed a route through the Charlotte Circle "and its multiple merge/diverge points" toward "a notable curve to the right," and that "identification of, guidance for, and conspicuity of, the path of travel needed to have been properly provided and maintained." He quoted from the United States Department of Transportation's "Manual on Uniform Traffic Control Devices for Streets and Highways" about the need for traffic control devices to provide the guidance and warnings required for safe and informed travel, and that maintenance is needed to keep devices visible and responsive to current conditions. He noted the 1984–87 drawing reducing the roadway to one lane of travel upon leaving the Charlotte Circle using pavement markings and snowplowable raised markers, which were not present at the time of the accident.

Because the record conveyed no recent "geometric or operational changes" on the roadway for a significant period of time before the accident, Kuperstein opined, with a reasonable degree of engineering certainty, that "this dangerous condition would have also existed for a notable, and noticeable, period of time, and its existence should have been noticed." In his view, a dangerous condition existed on the roadway "at, and before the occurrence of the accident" as a result of "the improper, and/or incomplete, maintenance of the roadway, and/or its lack of being built or constructed in conformance with an approved plan or design." He opined further that Rahul's accident was directly or proximately

caused by "the condition of the roadway, and its associated traffic control and guidance features (i.e. its improper or unsafe condition, and the lack of, or insufficient or improper, configuration and/or maintenance of same)." In his view, "proper positive guidance and maintenance would have assisted Rahul Patel in safely negotiating the roadway and remaining in his designated lane of travel."

In Kuperstein's March 10, 2003, deposition, he elaborated that when Rahul lost control of his vehicle, it was caused by "[t]he curbs, the curb sides, the pavement markings, any sort of roadway markings associated with the pavement, and perhaps signs." The "riding surface" of the road also may have been a factor. When asked whether "the curvature to the right around the circle was too sharp for Mr. Patel to control his car," Kuperstein responded:

> [A] vehicle traveling at the speed limit, that vehicle would not be exceeding, this term, the critical speed of that curve, but that curve is definitely a fact, in that speed with a reasonable degree of engineering certainty of Mr. Patel losing control of his vehicle.

Kuperstein defined as possible contributors to Rahul's loss of control the "debris and the partial obscurity of the curb on the right," the "indistinct identification of the left side delineation, in the context of this particular curve radius of its given radius," and "the lack of other traffic control devices" such as those on the 1984–87 drawing. Kuperstein opined that one lane would have been safer through the curve, but he left as an open question whether it was appropriate to return to a two-lane configuration over the bridge. The Luz accident was the only other crossover accident on the roadway of which Kuperstein was aware.

Kuperstein prepared a May 8, 2003, certification in response to the DOT's summary judgment motion in which he emphasized that all of the 1937 plans he reviewed were silent as to the number of westbound lanes that would be marked for the roadway. The 1984–87 drawings showed a design for only one westbound lane of travel at that point, and the October 16, 2000, plan for highway changes after the accident followed the same general format of those drawings. Kuperstein had reviewed all of the plans for the

roadway that were supplied in discovery as to both the Luz accident litigation and the present litigation, and none showed "an approved plan or design for striping, pavement markings or other traffic control devices, approving the pertinent area of Route 7 as a two-lane roadway prior to the accident in question."

In its written opinion dated August 5, 2003, the trial court reviewed the definition of a "dangerous condition" under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, and recited that Kuperstein had "identified the curvature of the road as the cause of the accident." The court found it significant that Kuperstein "found no deviation between the construction-plans showing the curvature of the road and the actual site conditions" and that he "does not find any particular fault with the fact that the road has two lanes in each direction at the actual site of the accident." The court further noted that Kuperstein "alludes to the lines painted on the road *after* the accident, reducing two lanes down to one around the Charlotte Circle, suggesting this act should have been done before the accident."

Because the roadway's design, including its "width, grade, curvature and curbing," was approved by the State Highway Commissioner in 1937, the trial court held that any assertions that those factors caused the accident "render the State immune from liability." As to the contention that the lines painted on the road reducing the number of lanes in the curve from two to one should have been done before the accident, and the additional assertion that more signage was needed, the court found that this argument implicated *N.J.S.A.* 59:4–5, which states that the public entity is not liable for injury caused by the "failure to provide ordinary traffic signals, signs, markings or other similar devices." Finding that this immunity extends to when the public entity created the situation necessitating the additional signals or signs, the court concluded that the DOT "is immune from liability with regard to Plaintiff's contentions as to the lining of the road in question, or the signage or lack thereof."

The parties represented in oral argument that plan and design immunity, *N.J.S.A.* 59:4–6, is not implicated in this case. Our focus is accordingly on whether ordinary traffic signal immunity applies. We comment briefly and only for context on plan and design immunity.

Plaintiffs contend that the trial court erred in granting the DOT's motion for summary judgment dismissing the complaint, because the two Tort Claims Act immunities relied upon did not apply. On appeal, however, the parties agree that the DOT was not entitled to plan and design immunity, *N.J.S.A.* 59:4–6, because it could not show that there had been an approved plan authorizing two westbound lanes of travel on the roadway.[2] With respect to ordinary traffic signal immunity, *N.J.S.A.* 59:4–5, plaintiffs contend that this immunity did not apply because whether the roadway should be painted with one or two lanes of travel was a design issue, not a traffic signal issue.

The Tort Claims Act sets forth a general rule of public entity immunity from liability, with narrow exceptions to that rule. *Vincitore ex rel. Vincitore v. N.J. Sports & Exposition Auth.,* 169 *N.J.* 119, 124, 777 *A.*2d 9 (2001). One of those exceptions is *N.J.S.A.* 59:4–2, the Act's general liability section. To recover under *N.J.S.A.* 59:4–2,

> a plaintiff must show that the property was in a dangerous condition at the time of the injury; that the injury was proximately caused by the dangerous condition; that the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred; and that a public employee created the dangerous condition or that the public entity had notice in time to protect against the condition itself.

---

[2] *N.J.S.A.* 59:4–6 provides that a public entity is not liable for injury "caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement" by an appropriate public entity or employee "exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved." Application of this immunity "turns on whether the public entity has approved the feature in question so as to immunize it from challenge." *Manna v. State,* 129 *N.J.* 341, 353, 609 *A.*2d 757 (1992).

[*Kolitch v. Lindedahl,* 100 *N.J.* 485, 492, 497 *A.*2d 183 (1985).]

■ The Act defines "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a. The "used with due care" standard "refers not to the conduct of the injured party, but to the objectively reasonable use by the public generally." *Garrison v. Tp. of Middletown,* 154 *N.J.* 282, 291, 712 *A.*2d 1101 (1998). "A use that is not objectively reasonable from the community perspective is not one 'with due care'." *Ibid.* "Thus the standard is whether any member of the general public who foreseeably may use the property would be exposed to the risk created by the alleged dangerous condition." *Vincitore, supra,* 169 *N.J.* at 125, 777 *A.*2d 9.

There is no real dispute that liability could not arise respecting a decision whether or not to install traffic control devices, including signs and roadway markers. The ordinary traffic signals immunity statute, *N.J.S.A.* 59:4–5, provides: "Neither a public entity nor a public employee is liable under this chapter [*N.J.S.A.* 59:4–1 to –9] for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices." Instead, the issue here is the applicability of this immunity to the roadway stripings to designate the number of lanes of travel.

■ The applicability of this immunity has been addressed in only a few reported cases. " 'The determination as to the advisability or necessity of a traffic sign or warning device at any particular place requires the exercise of discretion, and hence *N.J.S.A.* 59:4–5 simply specifies one particular type of discretionary activity to which immunity attaches.'" *Kolitch, supra,* 100 *N.J.* at 496, 497 *A.*2d 183 (quoting *Aebi v. Monmouth County Highway Dep't,* 148 *N.J.Super.* 430, 433, 372 *A.*2d 1130 (App.Div. 1977)).

■ This immunity applies whether or not the public entity itself created the condition necessitating the traffic signal or sign.

*Aebi, supra,* 148 *N.J.Super.* at 433, 372 *A.*2d 1130. In *Aebi,* the court held that the immunity applied to the failure to post a warning sign that the roadway width was abruptly reduced at the approach to a bridge. *Ibid.* In *Kolitch,* the immunity applied to the posting of a 50 miles-per-hour speed limit sign within 200 feet of a dangerous "vertical sag curve" and the failure to post a sign warning motorists to reduce speed in the curve. *Kolitch, supra,* 100 *N.J.* at 489–90, 497 *A.*2d 183.

In *Weiss v. New Jersey Transit,* 128 *N.J.* 376, 379, 383, 608 *A.*2d 254 (1992), the Court found that this immunity applied even where there was a "tortuous" eight-year delay in installing and activating a traffic light at a "notoriously dangerous railroad crossing." The Court noted that the commentary of the Task Force involved in drafting the Tort Claims Act referred to *Hoy v. Capelli,* 48 *N.J.* 81, 87, 222 *A.*2d 649 (1966), which endorsed immunity even where traffic signal installation was delayed. *Id.* at 383, 608 *A.*2d 254.

The parties agree that the only reported case in New Jersey that mentions liability for road markings is *Weiser v. County of Ocean,* 326 *N.J.Super.* 194, 198–202, 740 *A.*2d 1117 (App.Div.1999), which involved the issue of whether a county could be held liable for its failure to paint road markings or a turning lane on a State highway to warn motorists trying to turn onto a county roadway. The court wrote that "[i]f the County's culpability is its failure to paint markings, it is immunized from liability by *N.J.S.A.* 59:4–5[.]" *Id.* at 202, 740 *A.*2d 1117. The court noted a post-accident photograph in the record of striping painted on the highway to channel vehicles into a right-angled turn onto the county roadway. *Id.* at 199, 740 *A.*2d 1117. Contrary to plaintiffs' assertion, the *Weiser* court did not hold or imply that the *N.J.S.A.* 59:4–5 immunity would not apply to the State; the State's liability or immunity simply was not discussed. The main focus of the opinion was on the county's liability and how it could not be held responsible for painting marks on the roadway that was not "owned or controlled" by it. *Id.* at 200–02, 740 *A.*2d 1117.

■ We agree with plaintiffs, however, that the lane markings at issue here do not fall within the immunity of *N.J.S.A.* 59:4–5, because the issue here involved the State's action in affirmatively creating two allegedly dangerous lanes. Although the record does not disclose any plans or other evidence indicating when this first occurred, at some point prior to September 12, 2000, the State painted a broken line dividing the westbound portion of the roadway into two lanes. Their expert only makes the point obliquely, but plaintiffs expressly contend in their brief that this affirmative act of creating two lanes caused the dangerous condition involved in the accident. Plaintiffs also assert that the creation of two lanes may have been an ad hoc, unplanned change to the roadway, although nothing in the record confirms or denies that assertion. It is equally possible that the roadway was always used as a two-lane roadway, but no available plan or photograph has confirmed that this was so. Indeed, as noted, because of the absence of such plan documents or other evidence, the DOT recognizes that it cannot rely upon the plan and design immunity of *N.J.S.A.* 59:4–6 regarding the two-lane configuration.

The DOT frames the issue as "failure to paint markings on the roadway that guided a driver in a single lane around the curve," which would have been an appropriate characterization if the roadway was plain asphalt, with no markings at all, perhaps leaving drivers wondering whether the roadway accommodated one or two lanes of travel. Such a situation would have involved a "failure to provide ordinary traffic signals, signs, markings or other similar devices" that was immune from liability under *N.J.S.A.* 59:4–5. The present case did not involve an absence of a marking; the visible broken center line that created two lanes is the marking that plaintiffs view as problematic.

To be sure, plaintiffs' expert Kuperstein stated the causation issue broadly and imprecisely, and his opinion encompassed the immunity factors of failing to provide "proper positive guidance and maintenance" through painted markings and signs. Reading his statements with reasonable indulgence, however, as is appro-

priate in the context of a summary judgment motion, we note that his report nevertheless referred to the roadway's "associated traffic control and guidance features," including "insufficient or improper[ ] configuration." He further explained in his deposition that the accident's causes included "the pavement markings" and "any sort of roadway markings associated with the pavement." While that measure of vagueness may not offer a basis for substantial confidence that plaintiffs can actually prevail, it is sufficient to permit them to proceed beyond summary judgment on the theory that the pavement markings making two lanes instead of one on the roadway created a dangerous condition that contributed to the accident. As a result, it was error to grant summary judgment to the State on the ground of *N.J.S.A.* 59:4–5 immunity.

■ Presumably to avoid affirmance on grounds other than those relied upon for dismissal by the trial court, plaintiffs have set forth their view that they established a prima facie case for public entity liability for a dangerous condition under *N.J.S.A.* 59:4–2, so as to preclude summary judgment against them. The DOT contends that plaintiffs were unable to show a dangerous condition of the roadway when it was used with reasonable care.

We share, in part, the DOT's doubts as to the ultimate strength of plaintiffs' proofs. The DOT memo prepared after the accidents seeking funding for the roadway changes and citing a "dangerous safety condition" plainly does not require judgment in plaintiffs' favor. The memorandum surely sought to convey a sense of urgency for the funding, but it is not as a matter of law an admission of "dangerous condition" as defined under the Tort Claims Act.

Plaintiffs' proofs about the roadway's prior accident history, moreover, were unconvincing proof of the road's dangerous condition. Plaintiffs presented only a general listing of accidents in the area and De Cresce's nonspecific testimony that the roadway had been the site of numerous accidents. Only the Luz accident clearly represented an accident similar to Rahul's, and there is no

assertion that corrective action should have been undertaken in the twelve hours between the two accidents.

Nevertheless, we conclude that taking into account Kuperstein's report and deposition testimony as described above, plaintiffs have made a sufficient prima facie showing that the narrow two-lane configuration of the curve was a dangerous condition that contributed to causing the accident. No evidence was presented that Rahul was speeding or driving recklessly in a manner that would have caused an accident even on a safe road, and one can imagine situations (such a sudden blowout or swerving to avoid hitting highway debris, or an encroaching adjacent vehicle) during which a reasonable driver could strike a curb in a narrow roadway and lose control of the vehicle.

Plaintiffs also set forth a prima facie case that the DOT both created the dangerous condition and had sufficient notice of it to correct it, and that the DOT created the allegedly dangerous condition by painting the lines to make the roadway two lanes. The DOT also appears to have been on notice that the roadway was dangerous, as evidenced by the 1984–87 drawing that shows the area narrowing to one lane of travel, which can be inferred to have been created to address a known problem. On this issue as well, plaintiff's showings were sufficient to withstand a motion for summary judgment.

■ The most difficult hurdle to plaintiffs' proof of liability under *N.J.S.A.* 59:4–2 may well be in establishing that the DOT's creation and maintenance of the roadway in its dangerous condition was "palpably unreasonable." "Palpable unreasonableness is a question of fact." *Vincitore, supra,* 169 *N.J.* at 130, 777 *A.2d* 9. It means "behavior that is patently unacceptable under any circumstance" and that it must be "manifest and obvious that no prudent person would approve of [the public entity's] course of action or inaction." *Holloway v. State,* 125 *N.J.* 386, 403–04, 593 *A.2d* 716 (1991) (quoting *Kolitch, supra,* 100 *N.J.* at 493, 497 *A.2d* 183). There appears to be enough to permit the present case to go to a jury because the DOT presumably had some knowledge of

a problem that caused the 1984–87 drawing to be created in 1984, and then revised twice in 1986 and 1987. The unreasonableness of delaying implementation of the single-lane alignment in the 1984–87 drawing was bolstered by the view that this and the other recommended changes were relatively inexpensive to implement and very quickly accomplished by the DOT's own crews after the two October 2000 accidents occurred. It is by no means assured that the trier of fact would so conclude, given the absence of evidence as to why the 1984–87 drawing was made and revised, but these factors reasonably could lead a jury to conclude that the DOT's failure to act sooner was palpably unreasonable. Accordingly, we agree with plaintiffs that if no immunity exists, there was no other reason evident on this record to preclude plaintiffs from proceeding with their litigation against the DOT.

The order for summary judgment dismissing these consolidated actions is reversed, and the actions are remanded for further proceedings.

Reversed and remanded.