**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2004-19T1

THOMAS J. STEWART and
JULIE STEWART,

     Plaintiffs-Appellants,

v.

NEW JERSEY TURNPIKE
AUTHORITY/GARDEN STATE
PARKWAY and EARLE ASPHALT,

     Defendants-Respondents,

and

STAVOLA CONTRACTING
COMPANY and GEORGE HARMS
CONSTRUCTION,

     Defendants.

_____

Submitted January 4, 2021 – Decided January 19, 2021

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1328-17.

Drazin & Warshaw, PC, attorneys for appellants (Steven L. Kessel, on the briefs).

Pashman Stein Walder Hayden, PC, attorneys for respondent New Jersey Turnpike Authority (Dawn Attwood, on the brief).

GluckWalrath LLP, attorneys for respondent Earle Asphalt (Fay L. Szakal, of counsel and on the brief).

PER CURIAM

Plaintiffs Thomas J. Stewart and Julie Stewart[1] appeal from a January 8, 2020 order granting summary judgment to defendants New Jersey Turnpike Authority (Authority) and Earle Asphalt (Earle) (collectively, defendants). Because there are disputed issues of material fact relevant to the application of immunity under the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, we reverse and remand.

On April 18, 2015, plaintiffs were riding together on the same motorcycle, traveling north on the Garden State Parkway. With them, on separate motorcycles, were plaintiff's long-time friend, Jordan Vergara, and an acquaintance, John Castaunedo. The portion of the highway travelled by

---

[1] We refer to Thomas J. Stewart as plaintiff. His wife, Julie Stewart, has a per quod claim.

plaintiffs was undergoing road widening at the time, and the final layer of the road surface had yet to be applied.

Plaintiff proceeded to the Toms River Toll Plaza. After passing through the EZ pass express lane to the left of the toll plaza, he intended to maneuver the motorcycle to the farthest right lane. While in the left lane, just before an overpass bridge, plaintiff felt the motorcycle shimmy. Plaintiff smelled burning rubber and realized something was wrong with the motorcycle's rear tire. Plaintiff attempted to steer the motorcycle to the right shoulder of the roadway even though the bike was closer to the left shoulder at the time.

While changing lanes, the motorcycle began a "death wobble." Plaintiff described the wobble sensation, explaining the rear of the motorcycle "goes in and out" and "[t]he steering wheel fights you . . . ." Plaintiff regained control of the bike and continued to move toward the right shoulder of the road. As the motorcycle crossed into the right lane, plaintiff experienced another death wobble and fought to "maintain control and not die . . . ."

Vergara, who was travelling on his own motorcycle behind plaintiffs, witnessed plaintiffs' motorcycle wobble twice. When plaintiffs' motorcycle passed a "divider on the bridge[,]" Vergara saw the bike wobble a third time. Vergara described the divider as a "piece of metal . . . between the asphalt and

the concrete bridge."[2]  Vergara observed the divider was "higher than normal" and visible to someone traveling by motorcycle.  While Vergara was unable to state the exact height of the acclivity, he saw the expansion joint protruding above the roadway surface.  Vergara testified there was ongoing road work in the area of the overpass bridge on the date of the accident.

As plaintiff's motorcycle crossed the expansion joint, Vergara saw plaintiff lose control of the bike, resulting in plaintiffs being tossed from the motorcycle.  Plaintiffs did not notice the acclivity but subsequently learned from Vergara the expansion joint was higher than the road surface, causing the accident.  About a week after plaintiffs' accident, Vergara noticed a sign just before the overpass bridge warning motorcyclists to be aware.

An Authority supervisor for the road widening project testified at deposition the work on the bridge overpass was "substantially completed" on the date of plaintiffs' accident.  However, the Authority's project supervisor did not know if the final surface of the road had been applied.  He explained the roadway would be accessible to motorists even without the final paving layer but any

---

[2]  The parties sometimes referred to the divider as an expansion joint or an acclivity in the surface of the road.

A-2004-19T1

change in the road surface should have been tapered pending application of the final paving layer.

Earle was awarded the contract for the road widening on the Garden State Parkway. Earle's project supervisor testified the area where the accident occurred was "getting ready for final paving[,]" and an intermediate layer of the roadway was in place at the time of the accident.

Both supervisors testified the final layer of the roadway was not installed on the date of the accident. Neither supervisor was able to confirm whether the intermediate roadway layer had been tapered as the road approached the expansion joint. Nor did defendants proffer records indicating application of a taper on the road surface approaching the expansion joint at the time of the accident.

On April 4, 2017, plaintiffs filed suit against the Authority and Stavola Contracting Company (Stavola) alleging negligence. Plaintiffs subsequently amended the complaint to add Earle, George Harms Construction, and Midlantic Construction as defendants.[3] After completing discovery, the Authority and

---

[3] The Authority and Earle are the only defendants participating on appeal. The other defendants were dismissed by stipulation.

Earle moved for summary judgment, which plaintiffs opposed.  Defendants argued they were immune from liability under the TCA.

The motion judge granted defendants' motions for summary judgment, placing his reasons on the record on January 8, 2020.  The judge determined plaintiffs failed to proffer "sufficient evidence to establish a prima facie case of the existence of a dangerous condition on the section of the Garden State Parkway . . . which constitute[d] public property for purposes of any Tort Claims Act analysis."  The judge noted plaintiffs' pleadings "suggest[ed] there was debris/metal on the roadway that caused the rear tire to blow out causing the accident."  However, during the course of the litigation, the judge explained, "[p]laintiffs' liability theory changed and the alleged defect was an improper/unsafe acclivity in the roadway on an expansion joint over the Route 70 bridge."  Regarding plaintiffs' revised theory of liability, the judge found "there [was] no support in the evidentiary record" regarding "any unsafe acclivity in the roadway" and plaintiff admitted "he never observed a two-inch acclivity in the area" because he was "too busy trying to keep [himself] upright."

A-2004-19T1

Instead, plaintiffs relied on Vergara's observation of the acclivity at the expansion joint.[4]

Based on plaintiffs' responses to defendants' statement of undisputed facts,[5] the judge found:

> [T]he Turnpike inspected the reconstructed overpass prior to reopening of the relevant section of the Parkway and there [we]re no complaints requiring correction and/or revision of any part of the roadway and/or expansion joints[.] [N]or was there anything out of the ordinary with the bridge or expansion joints in this area.

The judge rejected Vergara's eyewitness testimony, finding nothing in the record to support a two-inch obstruction or acclivity in the roadway. While Vergara was unable to confirm the height of the acclivity, he testified there was a visible acclivity, which caused the accident. Vergara also testified there was a sign posted near the overpass bridge a week after the accident, warning

---

[4] Vergara told plaintiffs about the acclivity one month after the accident.

[5] As plaintiffs' counsel noted, defendants' statement of undisputed facts set forth general statements of habit and routine, explaining inspections would have been conducted during the road widening project and the road surface would have been tapered at the expansion joint. However, defendants presented no documents or other evidence the roadway in the area of the accident was inspected and, if so, when, or that there was a proper road taper near the expansion joint on the day of the accident. Therefore, plaintiffs' counsel had "no way of flatly contradicting" defendants' testimony.

motorcyclists traveling across the overpass. The judge failed to reconcile plaintiffs' responses to defendants' statement of undisputed facts with Vergara's eyewitness testimony regarding the accident.

The judge further concluded, "[T]here were no prior complaints about the condition of the Parkway in the subject area." In addition, the judge stated plaintiffs lacked expert testimony supporting a defect in the roadway creating a dangerous condition.

Despite the motion judge concluding plaintiffs failed to meet their burden by demonstrating a dangerous condition, he addressed plaintiffs' inability to satisfy the other elements necessary to overcome TCA immunity. The judge found plaintiffs' failure to "provide any competent and credible evidence the alleged defect and/or acclivity caused the accident" precluded a finding that a dangerous condition caused the injury. The judge explained:

> [P]laintiff . . . drove his motorcycle with a rear flat tire for a minimum of one mile on the Parkway and nearly lost control of the motorcycle on two occasions before the accident. Neither he nor his wife observed the condition at any time on the date of the loss including before or after the accident and did not learn of the alleged condition[] until one month after the accident . . . .

The judge also found "no evidence that the alleged condition of public property proximately caused the accident, nor [was] there any evidence the

public entity had actual or constructive notice of the alleged dangerous condition." In the absence of actual notice, the judge determined "plaintiff must establish sufficient proof as to whether [the] public entity ha[d] constructive notice of a dangerous condition to withstand summary judgment[,]" and plaintiffs failed to meet that burden by "offer[ing] any proof that the alleged dangerous condition was so open and obvious that it should have been discovered by the Turnpike and/or its employees in the exercise of due care prior to the accident . . . ."

In addition, the motion judge determined there was "no evidence that the Turnpike['s] conduct was palpably unreasonable." He explained, "[E]ven assuming the alleged acclivity and/or problem with the expansion joint was a dangerous condition that was a proximate cause of the accident, this condition generated no prior complaints or reports of injuries despite the fact that it existed on one of the most traveled highways in New Jersey." The judge, relying on the testimony of defendants' representatives, found "the roadway existed in the alleged condition for several months without causing any problems."[6] Based on

---

[6] It is axiomatic a car may easily traverse an acclivity in the absence of a road surface taper. However, the same is not necessarily true for a motorcycle crossing over the same acclivity. See DeBonis v. Orange Quarry Co., 233 N.J. Super. 156, 167 (App. Div. 1989) (holding loose gravel or quarry stones may

these findings, the judge dismissed plaintiffs' claims against the Authority with prejudice.

In examining plaintiffs' claims against Earle, the judge determined it was "subject to the protections of derivative immunity which recognizes that even though a particular entity or business may not satisfy the definition of a public entity under the Tort Claims Act, it may, nevertheless, be under the umbrella afforded to a public entity." The judge found Earle had a construction contract with the Authority to widen the Garden State Parkway, including the section of the roadway where the accident occurred, and Earle completed the "shoulder widening and overpass reconstruction" before plaintiffs' accident. Based on statements by defendants' representatives, the judge found "nothing out of the ordinary with the bridge overpass. Standard overpass construction procedures had been followed and there were no issues that needed to be corrected . . . ." The Authority confirmed its policy "through its resident engineers that 'everything is good to go' and 'in place' upon completion of a reconstruction

---

not be dangerous for cars or trucks but might cause an operator of a motorcycle to lose control, constituting a dangerous condition). We can take judicial notice there are more cars on the Garden State Parkway than motorcycles. Thus, the judge's observation there were no complaints or injuries reported due to an acclivity in the road is likely a reflection that a car, which is larger and heavier than a motorcycle, is less likely to be affected by an acclivity in the road surface despite being more likely to be traveling on the Garden State Parkway.

10

project and prior to putting traffic back on the roadway." The judge stated, "[T]here were no other complaints [from] motorists of defects that put motorists at risk in the area of the Parkway where plaintiffs' accident occurred." Thus, the judge found "Earle [was] entitled to derivative immunity because it was a contractor retained by a public entity, the New Jersey Turnpike, to conduct roadway construction" and "the work was successfully performed consistent with the plans which were designed by the Turnpike . . . ." Based on these findings, the judge granted summary judgment to Earle.

On appeal, plaintiffs contend the motion judge made factual findings despite material disputed facts concerning the existence of an acclivity in the roadway. Further, plaintiffs argue expert testimony was not required for the jury to find the existence of a dangerous condition for motorcyclists. In addition, plaintiffs assert they proffered sufficient evidence to overcome TCA immunity. As to Earle, plaintiffs claim there was no plan or specification followed by Earle to support derivative immunity.

We review an order granting summary judgment, applying the same standard as the trial court. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

The trial court must first determine whether there was a genuine issue of fact. Walker v. Atl. Chrysler Plymouth, 216 N.J. Super. 255, 258 (App. Div. 1987). The motion judge is required to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp., Inc. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2009) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)).

On this record, we agree there were genuine material disputed facts regarding the existence of an acclivity in the road surface creating a dangerous condition, precluding the entry of summary judgment under the TCA as a matter of law.

The fundamental principles embodied in the TCA include the notion that governmental immunity is the rule unless the TCA itself creates an exception. Kepler v. Taylor Mills Developers, Inc., 357 N.J. Super. 446, 453 (App. Div. 2003). In enacting the TCA, "[t]he Legislature had 'rejected the concept of a statute that imposed liability with specific exceptions . . . .

[Instead], 'public entities are immune from liability unless they are declared to be liable by enactment.'" Macaluso v. Knowles, 341 N.J. Super. 112, 117 (App. Div. 2001) (second and third alterations in original).

N.J.S.A. 59:4-2 provides a public entity is liable if a plaintiff establishes: (1) public "property was in [a] dangerous condition at the time of the injury"; (2) "the injury was proximately caused by the dangerous condition"; (3) "the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred"; and (4) "a negligent or wrongful act or omission of [a public] employee created the dangerous condition; or . . . a public entity had actual or constructive notice of the dangerous condition . . . ." Additionally, a public entity is not liable "for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable." Ibid. A plaintiff must prove the public entity's action or inaction was palpably unreasonable. Coyne v. N.J. Dept. of Transp., 182 N.J. 481, 493 (2005).

The TCA defines "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a). "[T]he critical question . . . is whether a reasonable factfinder could

13

have concluded that plaintiff demonstrated that the property was in a 'dangerous condition.'" Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 124 (2001) (citing Daniel v. N.J. Dep't of Transp., 239 N.J. Super. 563, 573 (App. Div. 1990)).

"[U]nder [our] indulgent summary-judgment standard of review," requiring the record be viewed in the light most favorable to plaintiffs, we disagree plaintiffs failed to establish evidence of a dangerous condition. Polzo v. Cty. of Essex, 209 N.J. 51, 75 (2012). Although plaintiffs' evidence is subject to challenge on credibility grounds, for the purposes of summary judgment, we must accept the testimony of Vergara, who witnessed the accident, as creating a material disputed fact regarding the existence of a dangerous condition, which precluded summary judgment.

Here, the judge had conflicting testimony from Vergara and defendants' project supervisors regarding the condition of the roadway. Vergara observed the motorcycle wobble three times and saw plaintiffs thrown from the motorcycle as it traversed the expansion joint. Vergara also saw the height of the expansion joint was uneven with the road surface. Vergara testified the accident occurred at the expansion joint and opined the uneven surface between

the road and the expansion joint was the reason for the accident.[7]  Vergara also explained there was a road sign near the overpass the week after plaintiffs' accident, warning motorcyclists to exercise care in the area where the accident occurred.

On the other hand, defendants' representatives admitted there was ongoing road paving work at the time of the accident.  They generally described routine inspections conducted as part of any road work project and discussed the customary practice of tapering height differentials between road surfaces prior to final paving.  However, neither defense witness had any personal knowledge regarding the application of a transition layer in the area of the accident prior to final paving or specific inspections of the roadway near the overpass bridge.  Nor did defendants provide documentary evidence to support a finding the intermediary road surface was tapered properly or when inspections were performed.

---

[7]  Expert testimony is not required when the subject matter can readily be understood by jurors using their common knowledge and experience.  Expert testimony is only required "when the subject matter to be dealt with 'is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was unreasonable.'"  Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J. Super. 320, 341 (App. Div. 2000) (quoting Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (1982)).  Here, an average juror would understand that unevenness in the road surface might cause a motorcyclist to lose control.

Having reviewed the record, according plaintiffs every favorable inference, we disagree plaintiffs failed to establish proof of a dangerous condition on the overpass that caused the motorcycle accident. This issue should have been presented to a jury to determine, after assessing the credibility of the trial witnesses, whether there was a dangerous condition on the roadway that caused plaintiffs' accident. Accepting the facts in the light most favorable to the party opposing summary judgment, plaintiffs demonstrated they were riding on a public roadway when they encountered a dangerous condition, which caused the accident and resulting injuries. We are satisfied plaintiffs have shown a reasonable jury could find a dangerous condition to overcome immunity under the TCA.

In addition, if plaintiffs prove a dangerous condition existed at the time of the accident, we are persuaded a jury could similarly conclude the dangerous condition was the proximate cause of the accident and created a reasonably foreseeable risk of the kind of injuries sustained. See Daniel, 239 N.J. Super. at 595 (quoting Polyard v. Terry, 160 N.J. Super. 497, 511 (App. Div. 1978)) ("Proximate cause is 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'"). Defendants will have

16

an opportunity at trial to present evidence of a tire failure or other mechanical malfunction as a superseding factor leading plaintiff to lose control of the motorcycle. A jury must resolve the proximate cause question whether the dangerous condition created a reasonably foreseeable risk that plaintiffs would have an accident and suffer injuries.

As to notice of the dangerous condition, plaintiffs asserted defendants had constructive notice of the roadway condition prior to the accident because, according to defense witnesses, it was defendants' job to discover problems during the road widening project through routine inspections. In addition, defendants conceded there was ongoing paving work in the area at the time of the accident and a final paving layer had not been applied. Constructive notice of a dangerous condition by a public entity occurs "if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b).

There are various ways a plaintiff may demonstrate constructive notice. For example, the appearance of the dangerous condition can establish constructive notice. See, e.g., Chatman v. Hall, 128 N.J. 394, 418 (1992) (finding the size of a pothole can indicate it existed long enough that a

public entity may have had constructive notice of its existence); Milacci v. Mato Realty Co., Inc., 217 N.J. Super. 297, 302-03 (App. Div. 1987) (finding the amount of dirt and sand accumulating on the floor of an office can indicate, if in existence long enough, that a public entity had constructive notice).

Here, the motion judge opined the Authority did not have constructive notice of the acclivity because the condition was not "so open and obvious that it should have been discovered by the Turnpike and/or its employees in the exercise of due care prior to the accident . . . ." However, if defendants were regularly inspecting the road project, as they claimed, a height differential in the road surface, as reported by Vergara, might have been open and obvious enough for defendants to have discovered the dangerous condition in the exercise of due care. Defendants' representatives testified the Authority had its in-house engineers at the construction site, and the Authority inspected the road before reopening the highway to the traveling public. A jury should assess Vergara's credibility regarding the existence of an acclivity and weigh that testimony against defendants' witnesses who may have failed to inspect the road or ensure there was an appropriate taper between the road surface and the expansion joint. The jury should determine, based on the testimony, if, in the exercise of due

care, the Authority "should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b).

We next examine whether defendants' conduct was palpably unreasonable for plaintiffs to establish liability against a public entity. See Coyne v. Dep't of Transp., 182 N.J. 481, 493 (2005); N.J.S.A. 59:4-2. Generally, the issue of palpably unreasonable conduct is a question of fact for the jury. See Vincitore, 169 N.J. at 130. However, a determination of palpable unreasonableness, "like any other fact question before a jury, is subject to the court's assessment whether it can reasonably be made under the evidence presented." Black v. Borough of Atl. Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993).

On this record, we are satisfied there are sufficient material issues of disputed facts, requiring a jury to determine whether the Authority's conduct was palpably unreasonable under the circumstances. If the Authority's personnel conducted routine and ongoing inspections of the road work project, a jury could reasonably determine the Authority's failure to notice an acclivity between the road surface and expansion joint before reopening the highway for travel was patently unacceptable, requiring urgent and immediate action to rectify the condition.

We next consider whether Earle was entitled to summary judgment based on derivative immunity under the TCA. The motion judge did not explain his basis for applying derivative immunity.

If derivative immunity was based on N.J.S.A. 59:4-6, Earle failed to present any approved plans or designs regarding the road widening project to accord such immunity. Nor did Earle present evidence the transition or intermediary layer between the road surface and the expansion joint was incorporated into any approved plans and that it followed such plans. Earle cited no specifications issued by the Authority addressing an acclivity and, therefore, was unable to demonstrate compliance with such a specification to be entitled to immunity. To receive immunity, "the defect that causes the injury must be in the plans before immunity is conferred." Thompson v. Newark Housing Auth., 108 N.J. 525, 535 (1987).

Because we are satisfied there were genuine material facts in dispute regarding defendants' entitlement to immunity under the TCA, the judge erred in granted summary judgment.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION